E-FILED
Thursday, 11 June, 2020  10:27:46 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ILLINOIS
CENTRAL DIVISION

| | | |
|---|---|---|
| ROSE MEACHAM, | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| UNIVESITY OF ILLINOIS, et. al. | ) | |
| | ) | |
| Defendant. | ) | |

**FOREWARD**

*Please accept this complaint against the University of Illinois et. al. and give it the care it deserves. The Plaintiff, Ms. Meacham, is seeking nothing more than justice from filing with the Central District Court and will be donating any monetary compensation that is earned from this case to help women who have been victims of sexual misconduct.*

*Ms. Meacham aims to have a fair and unbiased review of the facts in the Central District Court of Illinois because these unresolved issues, are shared issues for far too many students in the State of Illinois and the United States. Ms. Meacham is certain that giving these serious issues the attention they deserve in court will discourage retaliation against graduate students who report violations to keep campuses safer. This will also encourage Universities to improve their methods for addressing misconduct and harassment on-campus.*

*Ms. Meacham recognizes that the complaint format is not standard because she is currently pro se. She is submitting her complaint in the current format now to meet the EEOC deadline. She is consulting with the Chicago Bar Association and advocacy groups to refine the complaint, which will be finished by the end of the week.*

*Thank you so much for your time and careful consideration.*

## COMPLAINT

Plaintiff Rose Meacham ("Meacham"), pro se, brings this Complaint against Defendant University of Illinois ("the University") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* ("ADA"), and Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq.* ("Title IX").

As alleged in detail below, from approximately June, 2017 through the filing of this Complaint, Defendant has subjected Plaintiff to a widespread and continuous pattern of unlawful sex and disability discrimination, including unlawful retaliation for opposing Defendant's discriminatory conduct. Defendants' unlawful conduct included Plaintiff's unlawful termination on November 17, 2019, followed by an immediate dismissal notice from the University which was enforced on December 3, 2019. This decision was appealed by Meacham but her appeal was rejected by the Vice Chancellor for Student Affairs on December 16, 2019.

## I.   Jurisdiction and Venue.

1.   This Court has original jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§1331 and 1343(a)(4), and 42 U.S.C. §§2000e-5(f)(1) and (3).

2.   Venue lies within this District pursuant to 28 U.S.C. §1391, because the Defendant resides in this District in that it is subject to the Court's personal jurisdiction with respect to this action.

3.   This Court has jurisdiction of Plaintiff's claims pursuant to 42 U.S.C.§12117, and 42 U.S.C.§1983 under 42 U.S.C.§1988.

4.   This court has supplemental jurisdiction of the state court claims under 28 U.S.C.§1367.

5.     Venue lies within this District pursuant to 28 U.S.C. §1391, because the Defendants resides in this District and this District and a substantial part of the events omissions giving rise to the claims occurred in this district.

## II. The Parties.

1.     Plaintiff Rose Meacham is 35 years old and currently resides in Illinois, where she was displaced in light of the COVID-19 pandemic.

2.     Plaintiff earned a Bachelor degree in Psychology and Photography from Bard College in 2007.

3.     Plaintiff completed Graduate courses at New York University before attending the University of Illinois at Urbana-Champaign.

4.     Meacham was successful in her Graduate Studies at New York University, where she completed courses and held an internship and a paid position in two Neuroscience Laboratories.

5.     In 2013, Meacham won the Best Science Award at the World Science Festival and worked with researchers in the Physics Department at New York University. She was later invited to work with researchers at CERN.

6.     During her Graduate Studies, Meacham helped on a project with donations from Spike Lee that culminated in a feature film and public service community events to educate the public about science.

7.     Meacham worked as an Intern at Google, Adobe, Apple, and she owns her own Intellectual Property ("IP").

8.     Prior to starting her position at UIUC, Meacham helped found a non-for-profit women's organization to help victims of sexual harassment, assault, rape and discrimination.

3

9.     Meacham was admitted into the University's PhD program for Neuroscience and officially began her studies at UIUC in September 2017.  She was offered and accepted a research position to work for a specific professor in his Laboratory, and subsequently turned down other opportunities. The Neuroscience Program at UIUC is the only neuroscience program in the country, to our knowledge, that makes offers contingent on a graduate student's ability to gain an official appointment to work in a professor's Laboratory.

10.   As part of her PhD program, Meacham was also employed by the University as a Research Assistant.  However, approximately one month before starting this position at UIUC, Meacham's offer was switched and she was told to work in another laboratory under Brad Sutton's management. Her employment began in September 2017.  She worked for the University until her termination on November 17, 2019, which the University enforced on December 3, 2019.

11.   While a student at UIUC, Meacham was a member of the National Honors Society, she held straight As, and won awards from outside companies including a grant to fund her research. This decision was appealed by Meacham but the appeal was rejected by the Vice Chancellor for Student Affairs on December 16, 2019.

12.   Meacham at all relevant times has disabilities that were known by the University. Specifically, Meacham has gastrointestinal health issues and Irritable Bowel Syndrome. Meacham also has a disability constituting a neuropsychological weakness in processing speed and attention. Notwithstanding her disabilities, Meacham is fully capable of performing at a competitive level and has worked in top scientific research labs, as well as worked at top companies in her field.

4

13.   Meacham is a protected class based on sex and she was employed and studying at the University in STEM fields, which are male dominated.

14.   Throughout Meacham's employment with the University, she was denied accommodations for her known disabilities. This denial by the University continued during the University's termination of her employment and denial of her appeal.

15.   Throughout her employment with and attendance at the University, Meacham was also subjected to disability discrimination, including public shaming.

16.   Throughout her employment with and attendance at the University, Meacham was subjected to sex discrimination.

17.   After Meacham engaged in protected activities she was retaliated against and became a target for sex based harassment on-campus. Meacham was also the victim of sexual misconduct and unwelcome sexual advances from a Professor at the University.

18.   Defendant University of Illinois has campuses located in Urbana, Chicago and Springfield, Illinois.  The University is a recipient of federal funds within the meaning of Title IX, including from the National Science Foundation.

19.   Defendants include the University of Illinois (Urbana-Champaign); Office for Student Conflict Resolution; The Board of Trustees (Official and Individual Capacities), Aron K. Barbey (Professor of Psychology, Neuroscience, and Bioengineering at the University of Illinois at Urbana-Champaign; Director of the Intelligence, Learning; and Plasticity Initiative and the Decision Neuroscience Laboratory); Stephen Bryan (Associate Vice Chancellor for Student Affairs, Dean of Student Support & Advocacy and Acting Dean of Students); Robert J. Jones (Chancellor of the University of Illinois at Urbana-Champaign); Graduate College;

Neuroscience Program; Office of the Dean of Students; Office of the Provost; and Samuel

Beshers (Neuroscience Program Coordinator).

20.   Defendants include the aforementioned individuals and offices because it is their

role to provide student services, ensure safety on campus, and protect the student community.

However these representatives of the University of Illinois are not performing thier duties

and/or are abusing their power. This complaint highlights ample evidence to help identify

specific ways these offices and roles can be improved.

**III.    Exhaustion/Presuit Activities**

21.   Meacham made reasonable attempts to resolve the issues with the University.

Meacham reported Title IX, Title VII, and ADA Violations, as well as an unsafe work

environment to her manager and the supervisor for the department, but these individuals

supported the prejudice and refused to resolve the issues due to their own biases.

22.   Meacham also filed reports with the University's Title IX/ODEA Offices, the

Graduate College, and other administrative offices. She worked to resolve these issues with the

University through their own on-campus offices.

23.   During Meacham's good faith efforts to resolve the issues she reported, the

University made more efforts to deny Meacham's claims, to protect professors, and to avoid

liability, as well as efforts to force Meacham out of her position at the University. These actions

on the part of the University resulted in damages, including health problems, to Meacham.

24.   Meacham was never given reasonable accommodations throughout her efforts to

resolve issues with the University. This made it difficult for Meacham and placed the

University at an unfair advantage.

25.  Plaintiff has made reasonable attempts to resolve these issues by filing reports at UIUC with their Graduate College, Title IX, and other offices on campus. The Defendant has refused to provide reasonable accommodations throughout these cases, and is still refusing to provide reasonable accommodations.

26.   The Defendant has denied a fair and equal opportunity process to the Plaintiff and it is therefore impossible for these issues to be resolved without a federal court case.

27.  Meacham even spent personal funds on mediation to help resolve the issues with the University.

28.  Meacham passed-up opportunities to sue the University and pursue joint suits against the University in order to attempt to resolve issues and finish her employment and academic studies.

29.  Plaintiff worked with the University's Student Union to improve conditions for all graduate employee contracts based on the incidents Meacham experienced. Meacham worked with the Student Union and even communicated with the Department of Labor to improve contracts for graduate employees to prevent the issues she experienced from happening to other graduate employees.

30.  As a result of Meacham's attempts to resolve these issues, including her engagement with protected activities, she was forcibly withdrawn from the University.

31.  Meacham filed a pro se Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 19, 2019.  She had an in-person interview with an EEOC intake officer on March 4, 2020.  However, the EEOC investigator did not follow up with an investigation of Meacham's Charge or suggest that she amend her Charge.

32.   In her EEOC Charge Meacham alleged that Defendant discriminated against her based on her sex and disability and retaliated against her for engaging in protected activity.

33.   On May 11, 2020, for the first time, Plaintiff received notice (via email) that the EEOC issued a notice of right to sue related to her Charge, dated March 12, 2020.  Prior to that time, Plaintiff did not receive any requests for evidence from the EEOC, despite the fact her intake officer told her she would receive communications from an assigned investigator. She was never given the opportunity to Plaintiff was informed on May 11, 2020 that the EEOC did not investigate her claim and, instead, closed the claim without any review of the facts and without taking any testimony. Nor was Meacham given the opportunity to provide further information. Plaintiff never received a written Right to Sue Notice and was informed of her right to sue on May 11, 2020, in response to her inquiry of the EEOC regarding the status of her case.  Her requests to the EEOC to appeal or reopen her case were denied.

34.   Separately, in December 2019, Plaintiff filed a Charge of Discrimination against the University with the OCR, alleging unlawful harassment, sexism, sexual Misconduct and retaliation. These charges do not overlap with these employment issues and only the federal court has jurisdiction to address these incidents.

35.   Plaintiff has done more than is legally required to resolve these matters before bringing them to federal court. Meacham even spent personal funds on mediation and has clearly made more than a reasonable effort to resolve this case that she is now filing in your court seeking justice.

**IV.   Defendant's Discrimination and Harassment Based on Sex.**

36.   Meacham's contract and lab position at UIUC was first changed by Samuel Beshers in 2017 just a few weeks before I arrived to campus. During this time Beshers asked

me inappropriate questions about my political stance on the 'Google Manifesto' which the National Labor Review Board decided constitutes sexual discrimination and harassment. Beshers continued to make statements supporting the 'Google Manifesto' and other co-workers at UIUC harassed me about the same topic, making statements they also support these sexist ideas and that they felt I was not qualified for my position. Beshers refused to handle these incidents because he agreed with these discriminatory viewpoints.

37.    Meacham also reported that she was being targeted and bullied on topics about disability and sex but Beshers, and UIUC administration, allowed this to continue.

38.    After Meacham engaged in protected activities and official reporting, the Director of Meacham's PhD program sent her a written demand that she stop working on her women's non-for-profit that helped victims of sexual harassment, discrimination, rape, and assault.

39.    Meacham was told by male students that they thought she was a 'radical feminist', that they were 'afraid to work' with her because she engaged in protected activities and/or on account of her involvement with the women's non-for-profit.

40.    University administrators referred to Meacham as a 'Nasty Woman' which is a reference to the discriminatory phrase made popular by Trump. These statements, as well as others, ostracized Meacham from the University community and made it impossible for her to carryout her responsibilities and work in a safe environment.

41.    Many individuals who sexually harassed and discriminated against Meacham also denied her access to resources and/or refused to carryout their responsibilities for their own University roles.

42.  Meacham's adviser of record referred to her as a 'stray' animal. He also threatened her not to make official reports with Title IX or other University Offices. He told her that if she did engage in these protected activities she would be forced out of her PhD program at UIUC.

43.  Despite there being clear evidence The Title IX Office failed to identify clear Title IX rights violations when professors were accused.

44.  The Title IX Office ignored concrete evidence that Meacham submitted and instead favored professor opinions and the opinions of the respondents' friends and/or colleagues.

45.  The Title IX Office did not accurately depict Meacham's claims and even dismissed evidence, including witnesses that she provided. By omitting these supporting documents, facts, and testimonies, the final reports re-write history to make the professors and the University appear innocent.

46.  Title IX respondents shared confidential information from Meacham's reports as well as her reports to other administrators about confidential information.

47.  Deans in the Graduate College ignored concrete evidence that Meacham submitted and instead favored professor opinions and the opinions of the respondents' friends and/or colleagues.

48.  Deans in the Graduate College did not accurately depict Meacham's claims and even dismissed evidence, including witnesses that she provided. By omitting these supporting documents, facts, and testimonies, the final reports re-write history to make the professors and the University appear innocent.

49.  The University denied Meacham's right to a fair, unbiased review of the facts, in part, by engaging in practices that are clearly the University standard. Meacham's experiences

help support graduate employee and student claims that there is systemic silencing and/or retaliation for reporting rights violations.

50.   The University Deans and administrators disciplined Meacham based on sexism and sex based discrimination. These individuals shared sexist viewpoint among the professors Meacham reported.

51.   The reports Meacham shared with the University Offices on-campus and with administrators she sought help from regarding the sexism and discrimination, as well as retaliation, closed her reports or ignored them altogether.

52.   The mishandling of my Title IX reports and discrimination reports by the University prevented Meacham from being able to seek external reviews of many aspects of these incidents with federal and government agencies.

53.   The Title IX Office and other offices on campus repeatedly placed concerns for the University's liability before Meacham's health, safety and success.

54.   UIUC Graduate College and the Director of my PhD program gave me a set of responsibilities that were different than everyone else in my program, including the demand that Meacham stop working on my women's non-for-profit, and that made it impossible for me to carryout paid employment.

55.   Meacham suffered character defamation after sharing details about sexual misconduct from a Professor at the University. The Professor retaliated with character defamation and false claims that negatively impacted Meacham's reputation and opportunities.

56.   The Women's Resource Center at the University and other University Offices discouraged Meacham from reporting the sexual misconduct.

57.   The University's Title IX Office forced Meacham to undergo the reporting process for sexual misconduct without accommodations and during a time that was not realistic for Meacham.

58.   Meacham suffered damages due to the mishandling of her Title IX claims.

59.   Meacham was unable to maintain and/or seek opportunities at other organizations as a result of the way her Title IX claims were handled.

60.   The Title IX Office only investigated certain charges made by Meacham when it was impossible for her to engage in the process as was needed. This incident was used to make false accusations that Meacham made 'bad faith' claims and to cause further harm to Meacham.

61.   When Meacham was on-campus certain professors and administrators blocked me from student services and made me feel isolated and alone from the rest of the academic community. Meacham reported feeling unsafe on campus to the police and these reports, among others, were used against me by Deans and the people Meacham reported. Both students and professors are afraid of being reported by anyone because there is a fundamental, systemic problem with the way the university violates employee rights and subverts civil, state and federal laws to protect employees it views as most valuable. What they have created is a kind of war zone between victims and respondents, where victims are left unprotected from retaliation, which is carried out by people so scared of being reported they make it clear that whoever does is forced out. The way Meacham was treated is common and people were scared to work with me which made it impossible for me to be an employee at UIUC.

62.   Meacham was denied an employed position at UIUC after she was promised this position, due to the fact that she had been the victim of Title IX law violations and engaged in protected activities to report Title IX and Title VII incidents, as well as ADA Violations.

63.   It is also important to report that UIUC owns its own police force called the UIPD so students who try to report rape, assault, and other serious crimes are never able to find an unbiased authority with jurisdiction over the campus.

64.   The University's graduate employees and students are not allowed to report sexual misconduct and other Title IX incidents to police offices outside UIPD when these incidents occur on the University's campus.

65.   There are two neighboring police departments, one in Champaign, and one in Urbana, but neither office has jurisdiction over events on campus.

66.   Professors and the University are aware of the UIPD loopholes to avoid appropriate legal ramifications for their inappropriate or illegal actions.

67.   There is a direct relationship between the UIPD and the Office of Student Conflict Resolution (OSCR) and other University Offices such as the Graduate College. This constitutes a conflict of interest and it also results in the University's Graduate College, OSCR, and other offices to enforce academic punishments for reports filed in confidence with the UPID. It also means that other police offices outside the campus may be swayed or required, in some cases, to disclose confidential information shared with these police officers.

68.   Meacham was denied an employed position at UIUC after she was promised this position, due to the fact that she had been the victim of Title IX violations and engaged in protected activities to report Title IX and Title VII incidents, as well as ADA Violations. The professor interviewing her insisted that Meacham share private information about the Title IX violations even after Meacham objected. Meacham was denied the position until she shared information, and then when she did, the professor made sexist remarks and would no longer hire her.

69.  Meacham was subject to unlawful retaliation, sexual discrimination, and disability discrimination based on confidential information she shared with police officers outside the UPID. This part of the charge applies to multiple rights violations so it is repeated below. Please excuse the redundancy in this pro se charge.

70.  No reasonable response was taken by the University to address Meacham's reports, both informal and formal. Instead, Meacham was removed from all positions, and removed from the University.

71.  The harassment and discrimination Meacham reported were never prevented and removing Meacham was a repeat adverse reaction from reporting these illegal activities.

V.    **Defendant's Discrimination and Harassment Based on Disability.**

72.    In general the treatment towards people with disabilities is really poor at the University compared with treatment Meacham experienced at every other institution. Written allegations against Meacham were made by respondents in her Title IX charges that she "lied" about being qualified for accommodations. This type of statement is so unconscionable, there is no excuse for using a disability against someone in a petty act of retaliation. But the University supported these written forms of discrimination against Meacham and continues to support them.

73.    In general Meacham was appalled by the way students and employees with disabilities were treated. Meacham's own background and accomplishments were stellar before coming to the University and she was never forced to wear a public Scarlet Letter or be labeled as a disabled person in any of her other positions at any organization. University employees treated Meacham with disbelief, as if they believed people with disabilities were not capable of outperforming them. There was a general culture of prejudice that supported an antiquated

14

notion of a "disability" as being equivalent to being "stupid" or a "poor performer" or being "slow", even being 'dangerous' or a 'disruption' and an added "tax on university resources" (as Dean Stephen Bryan wrote to Meacham). The resources for students with disabilities were so, undeniably bad, that I can understand where these prejudiced notions might have been formed. If I had not studied at New York University, Bard College, or worked with researchers at Princeton University, CERN, Columbia University, among other schools, and if I only had exposure to the disability services on-campus, perhaps I would never know how successful people with disabilities can be, and are in lead positions throughout the country. I arrived at the University expecting to be treated equally, as I normally have been treated, but I was instead accused of "lying" about being disabled, accused of trying to gain special treatment when I requested my normal accommodations.

74.    Meacham shared information related to her disabilities in confidence with professors who violated her rights by spreading character defamation based on disability discrimination and prejudice.

75.    Policies and laws detailing the university's responsibility for providing accommodations were not followed.

76.    The University did not, at times, follow its own policies regarding accommodations. Meacham reported this to appropriate offices on-campus and these matters were never corrected. In fact, these issues are still ongoing.

77.    The accommodations Meacham requested were reasonable and were outlined by her doctors. However the University failed to provide reasonable accommodations.

15

78.    The University's Disability Resources and Education Services Office approved Meacham's accommodations based on her medical documents and letters. However, the University never gave Meacham these accommodations.

79.    The University has violated Meacham's disability rights by refusing to follow guidelines for processing documents and medical notes from doctors.

80.    Currently the Deans Office is demanding to be given unrestricted access to Meacham's doctors, medical records, and other confidential information as an unlawful requirement to be eligible for employment or enrollment at the University. This violates the University's own policies, as well as ADA laws.

81.    Graduate employees and students at the University register their disabilities with the Disability Resources and Educational Services (DRES) Office in order to protect their rights to confidentiality and other ADA rights. Professors and managers are given a letter from DRES to specify the approved accommodations. This protects the graduate employee and student rights by not revealing exact details about their disabilities. Most letters never even include the actual diagnosis so professors and managers are not privy by this information. Therefore the demands made by Deans that Meacham give Deans unrestricted access to this information from her doctors is unreasonable.

82.    The demands of Meacham to share confidential medical documents outside of DRES with the Deans is uncommon. Making this a requirement for her employment and/or enrollment is unlawful based on ADA laws.

83.    These ongoing activities have become a pattern of practice that has blocked Meacham from being issued approval for accommodations in a reasonable timeframe.

84.     These ongoing practices are currently being used to force Meacham to undergo unnecessary, unreasonable, and unfair added "assessments" in order to be employed by UIUC or to be a graduate student.

85.     Despite Meacham adhering to the University's own policies to gain approval for accommodations, which was not officially approved until December 2019, the University's Deans are operating outside these regulations and demanding unfair, and/or unreasonable, and/or unnecessary assessments in addition to the medical documents already approved by the University's own Disability Services Office.

86.     Shortly after Meacham informed a professor of her accommodations needs this professor changed their opinion about going on record as Meacham's adviser.

87.     Meacham has been held to unreasonable demands and deadlines that discriminate against her based on disability.

88.     Meacham was denied access to resources she needed to carryout her responsibilities at University of Illinois.

89.     Meacham was referred to as a "drain on university resources" by the University Deans and is being discriminated against based on disability.

90.     Meacham was forced to pay out of pocket for her own accommodations, and also pay out of pocket for her own healthcare.

91.     The ratio of medical doctors for the graduate employees and students enrolled at the University is an example of university-wide practices that discriminate against students with disabilities.

92.    Meacham was blocked from gaining approval for her accommodations, in part, due to the failure of the University to provide the medical care necessary for students with her common disability.

93.    Prior to September 2019, Meacham reported blocks to her accommodations, as well as retaliation that the University failed to resolve.

94.    Meacham was subject to character defamation by respondents in her Title IX claims.

95.    The University refused to resolve the discrimination Meacham reported.

96.    The University is still refusing to provide approved accommodations to Meacham.

97.    Meacham was unable to perform the duties of her employed positions at the University due, in part, to the fact she was never provided reasonable accommodations.

98.    There is even evidence to suggest a connection between discrimination based on disability and the Student Disciplinary Offices (OSCR).

99.    The University Dean contacted my manager in Fall 2019. Immediately after this contact I was denied accommodations.

100.   After the Dean contacted my manager in Fall 2019, I was demoted and/or terminated from my position.

101.   Meacham's medical disability was exacerbated by the incidents reported to the University.

102.   Meacham was denied services to help improve her health.

103.   Charges filed with the OSCR against Meacham negatively impacted Meacham's health.

104.   The burden placed on Meacham by the OSCR was unreasonable and she was forced to respond to this office without reasonable accommodations.

105.   Charges filed against Meacham in the OSCR negatively impacted her ability to carryout responsibilities at the University in Fall 2019.

106.   Stephen Bryan placed added burden on Meacham that negatively impacted her ability to carryout professional and academic responsibilities at the University.

107.   The majority of the charges filed against Meacham were not found to be valid.

108.   Stephen Bryan, Danita Brown Young and Justin Brown prevented Meacham from receiving accommodations in Fall 2019.

109.   The University's handling of incidents Meacham reported negatively impacted her health.

110.   The unaddressed and/or continued retaliation, discrimination, and harassment created health problems for Meacham.

111.   The University does not provide adequate medical services to graduate employees and students, which impacts graduate employees and students who have disabilities. Meacham was negatively impacted based on these inadequate services.

112.   Dean Stephen Bryan gave Meacham a letter that falsely states she "taxed university resources well beyond capacity".

113.   Dean Stephen Bryan gave Meacham a letter stating she "taxed university resources well beyond capacity" knowing that she had a disability.

114.   Dean Stephen Bryan gave Meacham a letter stating she "taxed university resources well beyond capacity" without allowing Meacham reasonable accommodations that she requested.

115.   Dean Stephen Bryan gave Meacham a letter stating she "taxed university resources well beyond capacity" without allowing Meacham reasonable accommodations that she requested.  In a forced withdrawal letter . This was used to justify forcibly withdrawing Meacham from the University

116.   Meacham was pressured by Deans to leave the University.

117.   Meacham is being denied copies of the charges filed against Meacham that were used to discipline her.

118.   Meacham is being denied information she requires in order to meet demands from the University.

119.   Professors abused their positions of power to discriminate against me based on disability.


120.   Engaged in protected activity and subsequently suffered employment damages.

121.   Employees who supported the University when I engaged in protected activities were treated better than Meacham, including being given awards, funding, and/or special recognition and/or praises.

122.   Employees who supported Meacham when she engaged in protected activities retired afterwards, left campus, quit and/or were terminated, and are not working on-campus.

123.   The Dean falsely claims that no attempts to seek accommodations were made by Meacham. He intentionally ignored statements made by Meacham and Meacham's hired mediator regarding the intimidation and false accusations that were made about her which made it difficult for her to engage in the process of gaining accommodations.

124.   In Meacham's particular case, she confided in professors and administrators about her accommodations needs but these individuals then shared this information without her consent as a way to defame her character and "warn" others not to hire Meacham.

125.   Meacham was issued threats of discipline that included allegations that she lied about being qualified to receive accommodations. Written character defamation of this nature was shared by professors behind Meacham's back and was used to intimidate her.

126.   Meacham shared with the Dean that she was intimidated by these ongoing threats and he stated that he would allow her to gain formal approval from DRES. He instead dismissed her before she was able to gain formal approval, despite his knowledge of her appointments with the DRES office. Based in part on the timing of these events it could be concluded that Meacham was dismissed, knowingly, to prevent her from receiving appropriate accommodations. Subsequently Meacham was forced to defend herself against retaliation in a formal appeal process without accommodations which placed her in a severe disadvantage.

127.   Meacham was denied the reasonable accommodations she requested repeatedly during her employment as a Teaching Assistant. Her manager denied these accommodations and after she reported this to the department, administrators and HR, her manager gave her a poor performance review.

128.   Meacham was denied all of the resources she needed to be successful in her position. During this time her role was diminished and she was then terminated from the role. The manager that she reported regarding these accommodations issues and discrimination based on disability, escalated the prejudiced comments and inappropriate actions against Meacham.

129.   Meacham was subject to public humiliation in front of other Teaching Assistants, despite her requests that this discrimination stop. Another Teaching Assistant was also creating a hostile work environment but nothing was done to prevent this from continuing.

130.   None of the other Teaching Assistants (TA) were subject to this type of treatment and when one TA tried to stand up for Meacham, she was reprimanded by the manager.

131.   After reporting the manager, Meacham's role was diminished and she was given a task that no other Tas were given. This task was also not part of her original responsibilities

132.   Meacham was demoted from a role that she was highly qualified to perform and she was given responsibilities that she was less qualified to perform. She expressed this fact and stated she was uncomfortable carrying out these new responsibilities. She said she was unclear about her responsibilities, and again requested accommodations.

133.   It is important to note that the employee orientation that she went through before starting her position went very well. She received high marks and the employees who trained her, as well as their associates, reviewed the work Meacham did and did not feel it warranted the adverse actions she received.

134.   In fact, the University employees who trained Meacham said that there was no reasonable cause for her role to be diminished and offered to work with her manager and Meacham to correct the issue. Meacham's manager refused. Instead Meacham was forced to work on new responsibilities she was not qualified to perform and then issued a poor performance review after this "review" period.

135.   Meacham was told by the Department that they were legally obligated to give her seven days to "correct her performance" but she never received this chance.

136.   The fact that Meacham's manager refused to allow the University office that trains employees to assist in Meacham's attempts to "correct her performance" is unreasonable. It also contradicts the false statements made by her manager and the department that Meacham made no attempts to correct her performance, when in fact she was blocked from doing so.

137.   Clearly Meacham's manager did not want to work with Meacham after Meacham requested reasonable accommodations.

138.   Clearly Meacham's manager discriminated against her based on disability.

139.   The actions taken by Meacham's manager and the department have becomes a pattern of practice that supports the warnings from graduate employees and students not to engage in protected activities. The University has a set way to handle these "problem" employees. Employees are blocked from resources necessary to do their jobs, they are given unreasonable or impossible responsibilities, and then they are falsely accused of "poor performance."

140.   It is important to note that Meacham was told publicly by her manager in front of the other Teaching Assistants that her manager believed Meacham was less qualified than all of the other TAs for her role.

141.   Her manager refused to stop making discriminatory comments like this even after Meacham asked her directly to please stop.

142.   It is relevant to mention that Meacham was in a position for Integrative Biology and has been offered a PhD position, including TA role, for a Biology Doctoral Degree. The statement that Meacham was "less qualified" is absurd and easily disproved. It represents the prejudice that the manager had towards Meacham after she learned of Meacham's disabilities.

143.   One incident with this manager included her refusal to provide clear instructions regarding Meacham's duties. This included her manager making statements that Meacham was not "engaging with the platform" as much as other TAs. Meacham explained repeatedly verbally and in writing that because of her disabilities her "engagement" will always look different. However, despite Meacham's documented attempts to gain clarification about what was expected of her, and how she could improve her "engagement" with the platform, her manager refused to share this information.

144.   Clearly Meacham's manager did not want to work with Meacham at all due to her disability.

145.   Meacham pointed out to her manager that there are in fact no guidelines in the University policies or student handbook that address online TA roles and how expectations for online engagement or performance are measured. She stated that the closest policy addressed stalking but that nothing outlined how employee performance was measured online. Not making these performance measures transparent sets employees up for failure.

146.   Meacham's manager and the department wrongfully terminated despite her repeat attempts to gain access to resources and despite her manager's and the Department Directors full knowledge of her accommodations requests. These events were used by Deans to remove Meacham from campus.

147.   It is important to note that Meacham was removed from her position and from campus because she reported that her manager was not being transparent about the way she measured Meacham's performance. This further demonstrates the culture at the University which negatively views employees and graduates who report workplace problems or violations in order to make things better for all employees. Meacham was treated like a "threat" to the

24

community at the University when in fact her "threatening behavior" is making online TAships
run more smoothly for all employees on-campus.

148.   Meacham has had the opportunity to sue the University on multiple occasions but
she has always worked to resolve issues internally. For example, her Title IX claims took
almost 2 years to complete, which is unreasonable. Meacham was patient and participated to the
best of her abilities in the Title IX process. Nothing about Meacham's actions warrants these
hostile actions against her or to be treated as a "threat".

149.   On the contrary, Meacham's continued efforts to report valid claims in good faith,
to improve the quality of life for all employees and students on-campus, have done nothing but
cost Meacham money, time, and have required hours of extra work. It is truly disappointing that
the University is currently a culture where she is continually reprimanded for working to
prevent problems she experiences from continuing or effecting others.

150.   The Student Union agreed with Meacham about the lack of transparency in the
requirements of her position. Meacham met with the Department of Education to help improve
university guidelines for employed positions like hers. Despite this fact, UIUC used Meacham
reporting this illegal evaluation policy and discrimination that were used to wrongfully
terminate her, as another way to discredit and harm her by forcibly withdrawing her.

151.   When the #MeToo movement happened Meacham started a non-for-profit
women's organization to help victims of rape, assault, harassment and sex based discrimination.
Her organization had support from professors in Engineering, Neuroscience and Psychology at
Columbia University, New York University, CalTech. She was offered support from Google,
Adobe, and other tech companies across the country. Meacham has worked hard to help others

and to be a positive addition to the communities she works in. Unfortunately, this mentality is not supported at the University, despite the fact is supported at so many other organizations.

152.  The fact that Meacham has done nothing illegal, nothing was done in bad faith or with bad intentions makes the adverse actions against even worse. It makes them even more hurtful. Meacham is the type of person who turns a negative into a positive through hard work. But these efforts were seen through a lens of prejudice, bias, and fear.

153.  Perhaps the twisted misinterpretations of Meacham's efforts to improve her community as "threats" and legal "liability" for the University says more about the current culture at the school than it says about Meacham. Based on statements from students and employees about the dysfunctional Title IX, ODEA, Graduate College, and administrative offices clearly something is not working and both victims and respondents are dissatisfied. This is evident in Meacham's experiences where she was retaliated against so horribly for engaging in protected activities there must be a way to improve these systemic failing so professors are not compelled to engage in retaliation based on their fear of these offices. It is Meacham's hope that by bringing this case to your court, you can help the University correct this problem so employees can engage in protected activities or ask for accommodations without being labeled a "threat" by Professors or accused of "taxing university resources" by Deans.

154.  It is also important to note that there is a major difference in the University's response to reports about professors versus reports about students. There is an undeniable imbalance in power and in Meacham's case her reports about professors resulted in extreme punishments. This is one of the motivations for raising these issues to your court. Rape and assault, sexual harassment and misconduct from a professor is an extremely scary experience by itself. Having professors and University officials retaliate, punish, and pressure graduate

26

employees and to remain silent on top of these horrific ordeals is so damaging we have to do something. The imbalance in power is enforced systemically within the University and Meacham hope you can help.

155.   One professor knew about my Title IX reports and believed Meacham was suffering from anxiety, even though she have no diagnosis of anxiety. She told me that students with anxiety are often just too anxious to be in a PhD program and that they don't belong there. This professor made attempts to deter Meacham from pursuing her PhD.

156.   A co-worker knew that Meacham was waiting for prescription medication for a disability one semester and told Meacham inappropriate stories about our boss removing people from the lab who have mental illnesses. For whatever reason this student assumed Meacham had a mental illness, despite the fact that Meacham does not have a mental illness. This student was working on a project to develop a screening process that diagnoses mental illness based on brain imaging techniques. The end goal was for this technique to identify people with mental illness and prevent their constitutional rights, among other restrictions to their lives. He did not like Meacham's view that people with mental illness deserve the same constitutional rights and quality of life as everyone else.

157.   The manager developing new techniques to diagnose mental illness for the purpose of granting a person constitutional rights, among other things, disagreed with my political views on the subject of mental illness. He expressed prejudiced and discriminatory opinions that Meacham felt uncomfortable hearing. She told the professor/manager that she disagreed with his controversial political views because false diagnoses of mental illness have been used throughout history to punish protected classes. She explained that making a diagnosis

about mental illness the basis for denying constitutional rights was a dangerous path to take and might be misused in dangerous ways against protected classes.

158.   During the conversation with her professor/manager about his technique for diagnosing mental illness, Meacham gave the classic example from women history classes about women in the 1800s and early 1900s who reported their husbands for beating them. There is a long, terrifying history of this occurring to women who report abuse and domestic violence. Until coming to the University, Meacham had not encountered a person who did not learn this basic part of history in school.  that until coming to Illinois Meacham had never met individuals who were unaware of this very basic part of most history or civics courses. Meacham explained to her professor/manager that historically women have been locked in mental institutions based on misdiagnoses that they are "hysterical" for reporting domestic violence and abuse.

159.   To Meacham's surprise, not only was her professor/manager unaware of this historical fact, but he made sexist remarks in response. He expressed prejudice based on sex and views about mental illness. Meacham was uncomfortable with this conversation and it was inappropriate to require her to have this discussion that was unrelated to the work she was doing for him at the time.

160.   The professor/manager required Meacham to have this discussion about mental illness and sex based discrimination in his personal car. He required that she ride with him to a lecture he demanded she attend as part of her responsibilities. She was completely trapped and was literally unable to escape from the offensive and prejudiced conversation, despite her attempts to do so.

161.   Meacham reported these events to the Title IX Office and other appropriate administrators but nothing was done to correct the situation. Instead, Meacham was targeted and further discriminated against because she defended the rights of people with mental illness.

162.   It is important to note that Meacham's disability documentation and medical notes from doctors about her accommodations requirements have been approved by the Disability Resources and Services Office but not by the University Deans or by the University professors or her managers.

163.   Meacham has worked with professors and bosses outside the U of I who suffer from different types of mental illnesses. For example, one of Meacham's role models has a severe mental illness but is the Director of an entire Division at Google. Another famous professor she has worked with at NYU is on-track to win a Nobel Laureate and his lab researchers the condition he has in rodent models. His work helps countless people.

164.   Hearing her U of I professor/manager, as well as her co-workers, speak with such prejudice about people with these struggles was one of the most unprofessional acts she has ever witnessed in her life. It hurt her on a personal level and made her uncomfortable to work around them. The discriminatory conversations continued throughout her time working with this lab and it was frightening to hear people talk about patients, and the human subjects they were experimenting on with such disrespect and disdain.

165.   Meacham felt ostracized and excluded from the team because they did not approve of her political views on mental illness and mental disabilities.

166.   One co-worker made unprofessional and violent descriptions of sawing open human bodies and human cadavers. The way he spoke about it was disrespectful to the people who donated their lives to science and went against the oaths medical doctors are required to

take. Meacham shared these comments with professors from other Neuroscience Labs outside U of I who confirmed this student would have been expelled, or placed on probation for the behavior that U of I did absolutely nothing to correct.

167.   Because Meacham reported this incident to administrators and Title IX, Meacham was made fun of by other employees in her PhD program (NSP). Information within her Title IX reports and reports to administration were confidential but were shared against her wishes.

168.   Meacham was harassed and bullied by professors and students who felt she was being too sensitive or overreacting to the prejudice and discrimination she reported.

169.   Meacham was also harassed by the co-worker who made these chilling comments about violently sawing open human heads, sharing details about the bone against the blade that really went overboard. This co-worker told Meacham she was not qualified to be in the lab, even though she was and had been hired by his boss after passing the interview. The co-worker demanded to know what her qualifications were and said he supported the 'Google Manifesto.'

170.   Meacham confirmed with the co-worker that he was aware that the 'Google Manifesto' argues that women are genetically inferior to men and subsequently less qualified in STEM positions. The co-worker confirmed he was aware of this and that he agreed with it. Because Meacham's employed position was a STEM role, he was discriminating against Meacham and creating a hostile work environment.

171.    This co-worker spoke about KKK rallies and made hate-filled statements that Meacham was also threatened by because he knew she was converting to Judaism at the time.

172.   Professors and other colleagues treated Meacham horribly, suggesting she was too inexperienced to understand the way Neuroscientists or medical students talk about cadavers. However, an unbiased review of the facts and Meacham's background proves she has in fact

2:20-cv-02162-CSB-EIL  # 1-1  Page 31 of 85

worked with researchers in more university's than her colleagues at U of I and is more versed in accepted practices as a result.

173.   Obviously genetic superiority, the KKK, discriminating against people (especially women) based on alleged mental illnesses are all inappropriate workplace discussions. It is truly inexcusable that Meacham's requests for her work environment to be comfortable were never resolved. Due to the fact that these incidents were never resolved, Meacham was forced to endure continued harassment, bullying, and other forms of intimidation because she reported these incidents. By not even protecting her right to report these incidents, the University created an ongoing problem for Meacham where people knew nothing would be done if they targeted her unfairly.

174.   It is even more inexcusable that Meacham's reports about these horrible incidents, were then the subject of a drawn-out Title IX investigation that was so mishandled there was no opportunity to seek an unbiased review of the facts in civil offices or government agencies. It is important to include these incidents because it proves that there is an obvious pattern in practices and repeat negligence on the part of the University.

175.   The pattern in practice and repeat negligence by the University has created a workplace culture where employees are frightened to report claims of discrimination. Similarly, employees openly discriminate because nothing happens when they do. As Meacham's case proves, employees who engage in protected activities suffer worse discrimination than if they remain silent.

176.   Meacham was denied the right to apply for fellowship funding by an administrator she openly disagreed with when he engaged in discriminatory rhetoric about people with mental disabilities.

177.   Based on Meacham's experiences of discrimination at the University, it is clearly a university-wide problem. Employees and graduates are not provided with enough medical doctors to treat even some of the most common disabilities. Meacham was forced to wait over 3 months to see doctors she needed. Instead, the University medical offices told her to visit the emergency room in order to be seen with the frequency she needed. Meacham was forced to pay out of pocket in order to receive the proper medical services.

178.   One incident in particular was extremely distressing and involved harassment from a Dean who Meacham had previously reported. The Dean interrupted Meacham while she was registering for courses, and trying to access resources at a student service building regarding her accommodations, employment role as a TA, applications for funding, and other needs.

179.   The Dean demanded that Meacham leave the building without explanation and Meacham quickly gathered her belongings and tried to leave. The Dean's office was on another level entirely within this large student services building and it was unclear why she would even come find Meacham on the first floor. There is no way to move between the different floors of the building without going outside to take the stairs which meant the Dean had gone out of her way to harass Meacham. Meacham moved towards the exit but was slowed by her disability. She moved as quickly as possible but the Dean continued to harass her.

180.   The Dean publicly humiliated Meacham throughout this incident and it was so frightening that Meacham never returned to this public student services building ever again.

181.   The Dean had approached Meacham a second time while she was exiting and had dropped belongings while she tried to race to the door.

182.   Meacham emailed the Dean's boss because this is not the first time Meacham had reported extreme bias and retaliation from this Dean. One report was an official grievance with the Graduate College but it was nevr resolved and Meacham was instead forced to continue working with this Dean who continues to discriminate and supports adverse actions against Meacham.

183.   The Dean made Meacham feel inadequate in front of others in the office. She felt embarrassed about her disability because the Dean publicly harassed and discriminated against Meacham.

184.   The Dean's behavior made Macham feel unwelcome, targeted, isolated from other employees and from the community. Despite her need to access resources in the Graduate College building, Meacham never felt comfortable returning again.

185.   The University refused to take Meacham's report about the incident. Instead the pattern of practice continued and the University misreported the incident to protect the Dean.

186.   It is essential to mention that in order to visit the student services building, Meacham has to walk over 2 miles on foot one way. In the Dean's report about the incident she describes moments where Meacham rests on a public bench. The Dean also describes Meacham pausing on a stoop outside the building where she caught her breath and rested before walking down a flight of stairs. These "behaviors" were labeled as "disobedient" in the Dean's reports and Meacham was punished for being slow and disabled.

187.   Meacham remembers being completely exhausted and uncomfortable but she was portrayed as a 'disobedient', dangerous, 'disruption' to the academic community. Meacham has been told by other students that the term 'disruption' is used to disguise prejudice about a disability.

188.   The portrayal of Meacham's disability is absolutely appalling and offensive discrimination.

189.   It is also important to note that less than one month prior to this incident, the Dean had been engaging with a mediator Meacham hired to help fill-in for the accommodations that she was continually denied by the University throughout the reporting process. This Dean had been the recipient of these reports and was engaging directly with my mediator or emails he wrote and/or partly wrote for Meacham. The Dean notes in one description about Meacham that her "behavior" had escalated in "aggression" despite the fact that most of these interactions were not perpetrated by Meacham, personally. It is clear that the Dean's true source of hostility and anger towards Meacham was the direct result of the reporting process she was in charge of managing. The incidents Meacham reported were never resolved by the Dean or her office; the Graduate College.

190.   Shortly before this incident, the University informed Meacham's mediator that she was not wanted back on-campus because she had "angered a lot of people by filing reports." The University expressed to Meacham's mediator that they wanted her to leave. In fact, Meacham's mediator made it seem as if restarting my PhD at another university was the only option, despite the fact this is illegal retaliation for engaging in these protected activities. This series of events is extremely important for this case.

191.   These incidents help capture the internal processes used by the University to wrongfully dismiss employees and graduate students. The University systemically denied Meacham accommodations which she required to have a fair chance to engage in her protected activities and reports. Because there was no "official record" of Meacham's disabilities during the reports of discrimination that she filed, Meacham was told it was not "legally

34

discrimination." Her impeded performance and "behavior" based on her disabilities was then literally used to file discriminatory charges against Meacham.

192.   All of these prejudiced and discriminatory actions against Meacham were then part of a forced withdrawal process, during which the University actually relied on Meacham's status as a person who is not disabled in order to falsely justify removing her from campus.

193.   The University would have lost their entire argument for removing Meacham from campus if her disabilities had been approved.

194.   Similarly, the professors Meacham reported to the Title IX/ODEA, and other offices on campus would have been found guilty of discrimination and/or prejudice if Meacham's disabilities were formally approved by the DRES Office.

195.   The University policies and student code specify that a student may not be forcibly withdrawn from campus unless all possible remedies have been exhausted first and if Meacham's accommodations had been approved, this would have been a possible remedy. Instead, the University blocked my ability to receive accommodations and the resources I needed to engage in protected activities and be successful on-campus.

196.   University professors were supported in making discriminatory depictions of Meacham, including character defamation, even though she did not have appropriate accommodations. These professors abused their positions of power and their roles within the community as medical experts to give Deans reason to make unreasonable and discriminatory requirements that Meacham is forced to complete in order to receive equal opportunities, equal access to resources and equal opportunities for employment at the University of Illinois Urbana-Champaign.

197.   The University burdened Meacham in administrative processes which were used to claim poor academic performance. The University supported false reports against Meacham filled with campus authorities, which made offensive accusations and discriminatory references to Meacham's disabilities and protected activities.

198.   Meacham was denied an employed position at UIUC after she was promised this position. The professor learned of Meacham's medical disabilities and was given a medical note from her doctor.

199.   Meacham was denied accommodations by the University's outright refusal to grant them, providing the wrong accommodations, creating an unreasonable and/or burdensome approval process to receive accommodations. The barrier to receive reasonable and often necessary medical support through the university healthcare plan and services adds to the unreasonable block to receive accommodations by making it burdensome and/or difficult to gain the required documentation to approve accommodations at UIUC. Furthermore, her "behavior" which was used to dismiss her from positions is covered under the disability services office approved accommodations for Meacham.

200.   The Deans abused their positions of power to use policies in place to handle real problem students at the University in order to dismiss Meacham for engaging in protected activities. It is clear from the actions taken against Meacham that many employees in positions of power over Meacham believe that it is their right to engage in discrimination and ADA violations. It is seen as a hiring preference and not an unlawful activity. My manager, for example, believed I would hold her back because of my disabilities. My accommodations needs were treated like a burden on her that she did not want to be forced to deal with. Similarly,

professors engaged in character defamation about Meacham's abilities and prevented her from receiving future employment opportunities.

201.  It is also important to report that UIUC owns its own police force called the UIPD so students who try to report rape, assault, and other serious crimes are never able to find an unbiased authority with jurisdiction over the campus. There are two neighboring police departments, one in Champaign, and one in Urbana, but neither office has jurisdiction over events on campus. Due to this fact, professors are aware of these loopholes to avoid appropriate legal ramifications for their inappropriate or illegal actions.

202.  In fact, there is a direct relationship between the UIPD and the Office of Student Conflict Resolution (OSCR) and other University Offices such as the Graduate College. This constitutes a conflict of interest and it also results in the University's Graduate College, OSCR, and other offices to enforce academic punishments for reports filed in confidence with the UPID. It also means that other police offices outside the campus may be swayed or required, in some cases, to disclose confidential information shared with these police officers.

203.  Meacham was subject to unlawful retaliation, sexual discrimination, and disability discrimination based on confidential information she shared with police officers outside the UPID. This part of the charge applies to multiple rights violations so it is repeated below. Please excuse the redundancy in this pro se charge.

**VI. Defendant's Unlawful Retaliation.**

204. Meacham suffered character defamation after sharing details about sexual misconduct from a Professor at the University. The Professor retaliated with character defamation and false claims that negatively impacted Meacham's reputation and opportunities.

205.  Individuals employed by UIUC who participated in retaliation against Meacham, were rewarded with university support to receive funding, university or program awards, as well as other forms of benefits.

206. After Meacham engaged in protected activities the University removed her from her position and placed her in a lab without funding to compensate her. Meacham was forced to work in labs without funding and was pressured to share her own Intellectual Property (IP) with the lab without any formal commitment or contract for a long-term position.

207.  The University denied necessary training to ensure my success in the PhD program and other employment positions as a researcher at the University after Meacham engaged in protected activities. This includes the opportunity to rotate in different labs which the Neuroscience PhD Program advertises is part of the opportunities it provides students. However, this advertised opportunity is misleading.

208.  There is a continuing violation and pattern of practice against employees in the U of I system, and specifically UIUC, who engage in protected activities. Meacham was the target of these patterns of practice which resulted in the closure of her EEOC case, without any investigation or even a proper detailing of the facts. Despite the fact that Meacham was promised by an intake officer that she would have the opportunity to present further details and evidence to an assigned agent on her case, this opportunity was never provided. These statements were made on March 4, 2020 but her case was closed abruptly on March 12, 2020. Additionally, Meacham filed her case in a timely manner on December 19, 2020 but no appointments were available within the EEOC's required timeframe for her to file the charge. Meacham has evidence to support this claim. Meacham was thus forced to visit the EEOC offices in-person in order to even have the right to file her case. It was also necessary for

38

Meacham to return on multiple occasions in-person, based on the lack of resources and staff in this office, in order to meet the EEOC's deadline. Therefore it is an undeniable pattern and practice throughout the state and Department of Education, to deny the right to a fair investigation and to deny these basic employment rights for employees within the U of I system. This is not inconsistent with articles published in the New York Times and in other media outlets that have reported a state-wide systemic oppression for victims of sexual harassment, discrimination, assault, rape, and other violations. In my case, it has been impossible to receive any fair, unbiased review of the facts.

209. After I made attempts to file official reports about this with the appropriate offices on campus and with the government, I was issued a list of requirements and deadlines that were unreasonable. The university was made aware of the fact these demands and deadlines were unreasonable and/or unfair but continued to permit these to occur. Many of these mandates made it impossible for me to fulfill my responsibilities as an employee and as a graduate student. There were many professors who tried to work with me who were unable to work with me due to these mandates.

210. Meacham was denied an employed position at UIUC after she was promised this position, due to the fact that she had been the victim of Title IX law violations and engaged in protected activities to report Title IX and Title VII incidents, as well as ADA Violations.

211.  The evidence in Meacham's federal charge helps identify places where the University of Illinois, specifically UIUC, misuses the government funding it receives to protect itself from legal "threats" but in doing so, refuses to correct underlying problems. Due to these misplaced efforts, UIUC is a financial burden on the State of Illinois because it is knowingly permitting professors or employees with positions of power to abuse the university's internal

policies and student codes to avoid responsibility for correcting illegal activities. As a result the

culture of UIUC, specifically in the Neuroscience Program (NSP), is one of fear where

professors are supported in retaliation against graduate employees and students who thus afraid

to even file charges. Meacham was warned by other students not to engage in protected

activities. Some of these students had valid claims against professors, but made statements like

they would not be able to finish their employment contracts, including PhDs, if they reported

these professors. When Meacham engaged in protected activities, she was retaliated against

immediately by Samuel Beshers, Neal Cohen, Martha Gillette, Dean Alexis Thompson, among

others. One common concern is that if professors are found guilty, those students will be forced

to move into new labs and will be forced to either begin their employed research projects over

from scratch or there wont be open positions for employment that they can be transferred into

after reporting their bosses. This is a very serious problem within the U of I, and specifically at

UIUC which advertises itself as a "Research Institution." Meacham was thrown out of projects

and forced to transfer into a lab where there was no funding and she was forced to begin a new

project 3 times, which resulted in delays of about 1.5 years. Based on Meacham's experience

and evidence for the federal charge, the fears among graduate employees at UIUC are

substantiated and call for oversight from the federal government to help ensure the rights of

these employees are upheld.

212.   Meacham was discouraged from engaging in protected activities or even filing her

reports with the Graduate College by professors and administration through direct verbal

threats, intimidation, harassment, discrimination and retaliation.

213.   Meacham was denied protection from retaliation such as her rights based on the

Ethics Act and Whistleblower Protection. Her reports were subject to misinterpretation and

misrepresentation based on the poor services provided by the on-campus Title IX and ODEA Offices, among others, which are undeniably understaffed and underfunded. Perhaps properly investing in these offices would ensure that employees who are working under graduate and student contracts are not forced to file the same cases with government agencies like the EEOC, OCR and federal courts.

214.   The internal UIUC policies and student codes conflict with the on-campus offices that handle protected activities. Meacham filed reports against professors who were then supported in retaliating against Meacham in UIUC's Office of Student Conflict Resolution and the Graduate College. The university was given the chance to correct these activities but did not do so in a reasonable timeframe and did not prevent damages from befalling Meacham that prevented her from carrying-out her responsibilities under the employment contracts and graduate contracts.

215.   Meacham's rights were violated based on Title VII laws, but she is not the only graduate employee reporting these incidents to the Department of Education in the state of Illinois. There is evidence of ongoing rights violations that the Department of Education actively refuses to correct. The continuing violations are supported by a pattern of practice. This pattern of practice includes but is not limited to willful negligence and willful delays of case processes. There are unreasonable added requirements for people who file reports and there is, perhaps, a lack of funding and resources provided to these offices in order to uphold worker rights. Based on my experience with the agent specifically assigned to handle UIUC cases, it is very obvious that unlawful activities, including conflicts of interest among the respondents and state government offices is partly responsible. Perhaps many of the strikes, on-campus protests, and ongoing dissatisfaction among employees registered with the UIUC Student Union would

be put to rest by fixing this clearly broken system. The State of Illinois wastes resources when offices like Title IX, OCR, and EEOC mishandle cases. Furthermore, the Department of Education would benefit from correcting the incidents highlighted in Meacham's federal charge because it would save the state money, resources and prevent further rights violations from even occurring.

216. One respondent in my Title IX charge wrote that he had in fact engaged in sex based harassment and discrimination. However, he was not found guilty by the Title IX investigator at UIUC. This individual was also retaliating against Meacham but there were no investigations made into these behaviors and the university protected his retaliation, discrimination, and harassment which was then used to formally prevent Meacham from maintaining her position at the university. It is highly possible, based on the evidence, that this is due to a culture of shared political views and biases that are upheld by the employees whose role it is to correct reported incidents of Title IX, Title VII, and ADA violations.

217. After working for a professor without compensation in either course credit or wages, Meacham was denied the funding and benefits promised by this professor when it was discovered Meacham was engaging in protected activities for Title IX, Title VII and ADA Violations.

218. The Plaintiff was retaliated against by the university, including Deans and Administration.

219. Meacham's Title IX reports were intentionally mishandled and closed prematurely in order to use these false findings to retaliate against me. For example, one report of retaliation was closed September 2019 and I was immediately charged with false retaliatory claims that cited specific incidents I had reported in my Title IX reports. These were used to discipline me

42

and the university conducted its own internal investigation again, but circumventing Title IX protections against retaliation by claiming they were using their own policies and university student code. This means the UIUC's own student code and university policies are designed to condone retaliation.

220. After Meacham reported illegal employment activity herr grades were changed which she objected to repeatedly, but she had no power to stop this from happening. Some of Meacham's grades and course credits were never corrected on her official transcript. The blame for the employment violations she reported was thus placed on her officially in her academic record. This is morally wrong and constitutes illegal retaliation.

221. There retaliatory measures were then used in later academic reports to portray Meacham as a 'poor performer' and 'poor student' and to even change her student status from good to poor, which blocked her from funding, blocked her from jobs on campus, and forced her to raise funds on my own. This is unheard of among graduate students and is undeniable retaliation.

222. The funding that Meacham raised for UIUC was delayed by administration and the processing took such a long time, I was forced to pay out of pocket expenses and endure financial hardships for more than 4 months. This was within the Neuroscience Program's (NSP) ability to prevent by simply requesting that the Dean implement a tuition waiver until my employment contract was finished and these unusual delays were corrected. The Dean expressed in writing he would approve the tuition waiver but NSP, specifically the respondents in my Title IX reports, refused to make this request. The request was not going to cost anyone funding, because the funds I raised for the university would cover these expenses. However the request would have made it possible for me to receive funding I needed to carryout my research

and to be paid for my employed position. The fact that the NSP refused to pay me, and forced me into financial hardship, knowingly extorting me for out-of-pocket expenses and also accepting the funding that I raised for them from the award I won, is inexcusable. It caused irreparable health problems for me, and I suffered irreparable damages to my professional relationships, as well as my opportunities to finish my work and benefit from the work by publishing. Publishing is a required part of being a graduate student and without publications there are less funding opportunities, less job opportunities, and students wont be allowed to graduate. I reported these retaliatory actions to UIUC Title IX but they refused to investigate and closed my claims. I also reported this to the Graduate College at UIUC, but they also closed my claims and refused to correct these damages which are still outstanding.

223. As part of the disciplinary process for filing Title IX reports and participating in this process Meacham was denied student resources, including accommodations, and she was given disciplinary sanctions. Meacham was forced to pay for equipment, resources, travel, publication entry fees, and work without pay as punishment for reporting discrimination and sexual misconduct. Meacham even paid for accommodations and mediation to help resolve these issues because the university refused to do this and would not stop retaliating. Meacham asked for reimbursement but never received anything for these expenses.

224. After Meacham engaged in protected activities the University made it impossible for Meacham to be successful in employed positions and she spent over $16,000 on accommodations/mediation alone in order to remain in the PhD program.

225. My requests that I be given an unbiased contact in my PhD program so I would not be forced to work with the person I reported and had a no-contact order against were ignored. He refused to allow me an equal chance to apply for funding, and refused to approve my being

44

hired by an adviser. In both cases I was forced to reach out to the Title IX Offices and Provosts for help.

226. Meacham reported not feeling safe on campus based on the retaliation she experienced from engaging in protected activities and also based on the discrimination against her. Because these reports were never addressed Meacham was forced to study remotely at her own personal expense. She was forced to pay out of pocket for resources at another university in order to address the issues she reported to the University because they refused to do so themselves.

227. Stanford University offered her the opportunity to study in the Mechanical Engineering Department and without this opportunity, Meacham would never have been able to complete the unreasonable requirements and deadlines that the University of Illinois gave her as part of their retaliation against her.  At Stanford University, Meacham was able to complete work, receive academic support, and other standard resources that she had been denied by University of Illinois.

228. The University retaliated against Meacham by changing the source of her funding in an employed contractual position. Meacham contested these unlawful changes to her contract but the administration, including HR, refused to prevent this retaliation. Instead, these University offices forced Meacham to sign a new contract under duress, which she documented and contested in writing. After investigating possible reasons for their pressure to changer her contract after she reported her manager to the Title IX Office, she learned that this change blocked her from Student Union representation, among other rights. It also helped conceal the incidents she reported on permanent records in the University's system. Instead, the damages were placed on Meacham and she was issued an "Incomplete" grade, instead of the Passing

grade she had earned. This means that she also never received proper credit and compensation for her research in the lab. The University refused to address her reports and handled it instead by damaging Meacham, changing her contract, removing her from the position and forcing her to start the work over with another professor. These delays permanently impacted her position at the University and negatively impacted her Internship at Apple Inc.

229. The university allowed allegations against Meacham to be made that were false. Some of these allegations used claims Meacham made about professors and during her official reports to administration that the university refused to rectify to place the blame with Meacham. The use of official reports filed by Meacham to retaliate is illegal.

230. Furthermore, Meacham was punished and charged wrongfully for meeting requirements that she had previously reported as being unreasonable and/or unfair. This includes instructions and/or directions Meacham was given by UI employees, that were later used as false allegations that she was a poor student, and/or had not performed in accordance with policies. She was also falsely accused of "behavior" that warranted punishment but was denied resources necessary to properly defend herself.

231. Meacham has been retaliated against and held to unreasonable demands and deadlines that discriminate against her based on disability.

232. After Meacham reported to the Board of Trustees that the OSCR uses "subjective" assessments to enforce discipline on students, she was charged and disciplined by this office. She never received a fair, unbiased, judicial process after engaging in protected activities and the Deans carried-out disciplinary measures with full knowledge of her engagement with protected activities.

46

233. Meacham's PhD Neuroscience Program (NSP) at the university and other University Offices delayed processes such as correcting adverse actions taken against Meacham. For example, when Meacham was retaliated against and her student status was wrongful changed. She requested that this retaliation be corrected but it was not addressed in a timely manner. Correcting the change to her student status was purposefully delayed until after funding opportunities and benefits were withheld. She was intentionally blocked from funding opportunities at the University and other benefits which forced her to study remotely. When her student status was finally corrected she was eligible for the Honors Society and other awards but was unable to receive them based on the delays. These damages are irreversible and the opportunities lost cannot be repaid.

234. Meacham was forced to work with respondents of her Title IX claim without any mediation or protective measures in place to prevent further retaliation, discrimination and harassment. One respondent had a no contact order placed on him and by closing the Title IX investigation the university lifted this protective measure. The results included blocks to university resources, funding opportunities, and the refusal to approve new work opportunities on-campus.

235. Meacham was denied access to resources she needed to carryout her responsibilities at University of Illinois. Among the resources Meacham sought were services provided by her program that every other student was given, except Meacham.

236. In November 2019 UIUC Deans removed Meacham from campus at the request of the professors she reported to Title IX and federal agencies. These adverse actions against her mean that due to the retaliation against her, she was punished for participating in these protected activities by preventing her from finishing her entire PhD.

47

237. By retaliating against Meacham the University and the professors Meacham reported were able to make an example out of her to prevent other students from filing reports with protected offices. The number of students who warned Meacham not to file because it would ruin her academic and professional career is staggeringly high. It became a widely discussed matter where everyone in her PhD program knew she was engaging in these protected activities. If the University had not retaliated and had allowed her to be successful in the program after filing her reports, it would have discredited the professors she reported and confirmed that it is possible for students to engage in protected activities without suffering severe damages.

238. There is evidence to prove the Deans and Chancellors acted outside of their roles to knowingly support retaliation against Meacham. When Meacham's Title IX respondents demanded she be removed from campus, the university carried-out this retaliation. The Deans and Chancellors tried to claim that she had violated student code, based on false charges against her that were never given a fair, unbiased review. For example, their own policies and student code states that students must never be forcibly withdrawn unless every avenue has been explored to remedy the situation. Meacham's appeal cited this policy and the fact that her accommodations were approved but never implemented. With full knowledge about the Title IX reports, the professor's sexual misconduct and the blocks to her accommodations, the Deans refused to consider her appeal. Meacham was told that appeals are never approved. This further supports the danger of allowing the University to make "subjective" rulings about student disciplinary measures because it conflicts with their Title IX, Title VII, and ADA rights.

239. As a result, Meacham was wrongfully removed from campus and retaliated against by respondents in her Title IX reports and by administrators who referred to her disabilities as 'disruptions'.

240. There is evidence to suggest that Meacham was blocked from working with people at other organizations, and at UIUC based on the character defamation from my Title IX respondents such as Samuel Beshers, Martha Gillette, Stephanie Pregant, and others, and from UIUC administration, including Alexis Thompson, Stephen Bryan, Justin Brown from the OSCR.

241. The Title IX reports included one version that cited race as the basis for one aspect of my claims. However no measures were taken by the university offices to ensure this claim could be safety investigated. There are in fact no clear laws within Title IX or OCR or the Department of Education that even address how to handle this aspect of my claim. This would require the decision of a federal court so that these offices have the necessary regulations outlining how they must even handle this aspect of Title IX, Title VII, and civil rights violations in this context.

242. In charges filed against Meacham with the Office of Student Conflict Resolution (OSCR), which handles disciplinary actions against university students, references were made to Meacham's engagement in protected activities at other organizations. When Meacham requested copies of these charges, she was denied. When Meacham requested to view these charges with the appropriate accommodations, and to have the necessary time to read and review these charges, which included protected activities, she was denied. Instead, she was charged and the disciplinary measures are in place.

49

243. Meacham reported that Title IX investigators mishandled her charges. She also presented the university-level problems with the Title IX/ODEA process to the Board of Trustees in Spring 2019. After these reports were made by Meacham, her cases were still mishandled, but also prematurely closed, in some cases. Later, she was also retaliated against by the Title IX/ODEA officers.

244. As part of the retaliation against Meacham, she was blocked from necessary resources to perform her duties by UIUC employees and administration. One incident involved a Dean who discriminated against her based on disability. This Dean was already reported by Meacham for engaging in retaliation against her, but the university refused to even address these problems. This Dean harassed Meacham repeatedly in-person in one such horrifying incident where she prevented Meacham from registering for courses and seeking resources from a public student services building. Meacham was publicly discriminated against and harassed and then retaliated against for seeking help from this Dean's manager. Based on this retaliation other Deans supported further retaliatory activities against Meacham. She was further targeted and subject to false character defamation. She was discredited based on these activities. The result of these actions was more intimidation and denial of resources.

245. The University has systemic policies that supported retaliation against Meacham and Deans whose role it is to protect students did not ensure her safety on-campus. Meacham first reported feeling unsafe on-campus after she was threatened by professors in Fall 2017. Instead of prevent the reported harassment, bullying, and retaliation, the University removed Meacham from campus in Fall 2019.

246. This further demonstrates the systemic retaliation enforced by a broken university system, whereby graduate employees reports are dismissed, downplayed, and/or ignored, and

instead an imbalance of power is created to protect professors guilty of violating civil, state and federal laws.

247. It is also important to report that the University owns its own police force called the UIPD so students who try to report rape, assault, and other serious crimes are never able to find an unbiased authority with jurisdiction over the campus. There are two neighboring police departments, one in Champaign, and one in Urbana, but neither office has jurisdiction over events on campus. Due to this fact, professors are aware of these loopholes to avoid appropriate legal ramifications for their inappropriate or illegal actions. In fact, there is a direct relationship between the UIPD and the Office of Student Conflict Resolution (OSCR) and other University Offices such as the Graduate College. This constitutes a conflict of interest and it also results in the University's Graduate College, OSCR, and other offices to enforce academic punishments for reports filed in confidence with the UPID. It also means that other police offices outside the campus may be swayed or required, in some cases, to disclose confidential information shared with these police officers.

248. The UPID did not address Meacham's reports and she was forced to seek help from police officers outside the UIPD. Meacham was subject to unlawful retaliation, sexual discrimination, and disability discrimination based on confidential information she shared with police officers outside the UPID. The University's Office for Student Conflict Resolutions (OSCR) cited confidential reports she shared with these external law agencies as justification for disciplining her on-campus. Attempts were made to discredit Meacham based on these reports.

249. Meacham was subject to retaliation including Interference with her Apple Inc. contract and prospective opportunities with other organizations. The University approved

51

Meacham to work at Apple Inc. as an Intern in Summer 2018 but then violated Meacham's rights after she engaged in protected activities by forcing her to sign a legal contract with the University at the threat of academic punishment. The contract with NSP violated her Non Disclosure Agreement (NDA) with Apple Inc. and she was punished for refusing to violate her NDA by the University. The University changed Meacham's academic status from "good" to "poor".

250. This resulted in loss of funding opportunities and also prevented Meacham from receiving value for her work, as well as honors such as from the National Honors Society. Meacham was entitled to these opportunities, awards, and earned value, based on her work and achievements at U of I. The NSP, specifically the professors who Meacham reported for illegal activity, benefited from these adverse actions against Meacham, in part because fabricating false portrayals of Meacham as a poor or unqualified employee and student disproved Meacham's charges against them.

251. After engaging in protected activities, Meacham was blocked from job opportunities and she was not properly compensated for her work at UIUC. Meacham did not receive course credit and other forms of value that other employees and graduate students receive. In fact, the university went out of its way to ensure that Meacham's official transcript was damaged and refused to correct false information, inconsistencies, or even release her final grades for work she completed. In academia, graduate employees are compensated for their work on campus in the form of course credit in place of the normal financial compensation these employees would otherwise be entitled to receive.

252. Additionally, there is evidence to support the claim that the same professors who demanded Meacham be disciplined for reporting them to Title IX and for engaging in protected

activities, also blocked Meacham's ability to work in other job positions she was offered. These job offers were withdrawn after she accepted them and the professors she reported were working directly with these professors and their colleagues.

253. The pattern of practice in retaliatory measures against victims like Meacham who report sexual misconduct, harassment, and discrimination creates a culture where victims are pressured to remain silent. This hurts the entire campus and can hopefully be brought to the attention of officials who are able to correct this systemic issue in court. This impacts graduate employees across the state of Illinois.

254. The Plaintiff was retaliated against by the university, including Deans and Administration.

255. Meacham's Title IX reports were intentionally mishandled and closed prematurely in order to use these false findings to retaliate against me. For example, one report of retaliation was closed September 2019 and I was immediately charged with false retaliatory claims that cited specific incidents I had reported in my Title IX reports. These were used to discipline me and the university conducted its own internal investigation again, but circumventing Title IX protections against retaliation by claiming they were using their own policies and university student code. This means the UIUC's own student code and university policies are designed to condone retaliation.

256. After Meacham reported illegal employment activity herr grades were changed which she objected to repeatedly, but she had no power to stop this from happening. Some of Meacham's grades and course credits were never corrected on her official transcript. The blame for the employment violations she reported was thus placed on her officially in her academic record. This is morally wrong and constitutes illegal retaliation.

257. There retaliatory measures were then used in later academic reports to portray Meacham as a 'poor performer' and 'poor student' and to even change her student status from good to poor, which blocked her from funding, blocked her from jobs on campus, and forced her to raise funds on my own. This is unheard of among graduate students and is undeniable retaliation.

258. The funding that Meacham raised for UIUC was delayed by administration and the processing took such a long time, I was forced to pay out of pocket expenses and endure financial hardships for more than 4 months. This was within the Neuroscience Program's (NSP) ability to prevent by simply requesting that the Dean implement a tuition waiver until my employment contract was finished and these unusual delays were corrected. The Dean expressed in writing he would approve the tuition waiver but NSP, specifically the respondents in my Title IX reports, refused to make this request. The request was not going to cost anyone funding, because the funds I raised for the university would cover these expenses. However the request would have made it possible for me to receive funding I needed to carryout my research and to be paid for my employed position. The fact that the NSP refused to pay me, and forced me into financial hardship, knowingly extorting me for out-of-pocket expenses and also accepting the funding that I raised for them from the award I won, is inexcusable. It caused irreparable health problems for me, and I suffered irreparable damages to my professional relationships, as well as my opportunities to finish my work and benefit from the work by publishing. Publishing is a required part of being a graduate student and without publications there are less funding opportunities, less job opportunities, and students wont be allowed to graduate. I reported these retaliatory actions to UIUC Title IX but they refused to investigate

and closed my claims. I also reported this to the Graduate College at UIUC, but they also closed my claims and refused to correct these damages which are still outstanding.

259. As part of the disciplinary process for filing Title IX reports and participating in this process Meacham was denied student resources, including accommodations, and she was given disciplinary sanctions. Meacham was forced to pay for equipment, resources, travel, publication entry fees, and work without pay as punishment for reporting discrimination and sexual misconduct. Meacham even paid for accommodations and mediation to help resolve these issues because the university refused to do this and would not stop retaliating. Meacham asked for reimbursement but never received anything for these expenses.

260. After Meacham engaged in protected activities the University made it impossible for Meacham to be successful in employed positions and she spent over $16,000 on accommodations/mediation alone in order to remain in the PhD program.

261. My requests that I be given an unbiased contact in my PhD program so I would not be forced to work with the person I reported and had a no-contact order against were ignored. He refused to allow me an equal chance to apply for funding, and refused to approve my being hired by an adviser. In both cases I was forced to reach out to the Title IX Offices and Provosts for help.

262. Meacham reported not feeling safe on campus based on the retaliation she experienced from engaging in protected activities and also based on the discrimination against her. Because these reports were never addressed Meacham was forced to study remotely at her own personal expense. She was forced to pay out of pocket for resources at another university in order to address the issues she reported to the University because they refused to do so themselves.

55

263. Stanford University offered her the opportunity to study in the Mechanical Engineering Department and without this opportunity, Meacham would never have been able to complete the unreasonable requirements and deadlines that the University of Illinois gave her as part of their retaliation against her.  At Stanford University, Meacham was able to complete work, receive academic support, and other standard resources that she had been denied by University of Illinois.

264. The University retaliated against Meacham by changing the source of her funding in an employed contractual position. Meacham contested these unlawful changes to her contract but the administration, including HR, refused to prevent this retaliation. Instead, these University offices forced Meacham to sign a new contract under duress, which she documented and contested in writing. After investigating possible reasons for their pressure to changer her contract after she reported her manager to the Title IX Office, she learned that this change blocked her from Student Union representation, among other rights. It also helped conceal the incidents she reported on permanent records in the University's system. Instead, the damages were placed on Meacham and she was issued an "Incomplete" grade, instead of the Passing grade she had earned. This means that she also never received proper credit and compensation for her research in the lab. The University refused to address her reports and handled it instead by damaging Meacham, changing her contract, removing her from the position and forcing her to start the work over with another professor. These delays permanently impacted her position at the University and negatively impacted her Internship at Apple Inc.

265. The university allowed allegations against Meacham to be made that were false. Some of these allegations used claims Meacham made about professors and during her official

reports to administration that the university refused to rectify to place the blame with Meacham. The use of official reports filed by Meacham to retaliate is illegal.

266. Furthermore, Meacham was punished and charged wrongfully for meeting requirements that she had previously reported as being unreasonable and/or unfair. This includes instructions and/or directions Meacham was given by UI employees, that were later used as false allegations that she was a poor student, and/or had not performed in accordance with policies. She was also falsely accused of "behavior" that warranted punishment but was denied resources necessary to properly defend herself.

267. Meacham has been retaliated against and held to unreasonable demands and deadlines that discriminate against her based on disability.

268. After Meacham reported to the Board of Trustees that the OSCR uses "subjective" assessments to enforce discipline on students, she was charged and disciplined by this office. She never received a fair, unbiased, judicial process after engaging in protected activities and the Deans carried-out disciplinary measures with full knowledge of her engagement with protected activities.

269. Meacham's PhD Neuroscience Program (NSP) at the university and other University Offices delayed processes such as correcting adverse actions taken against Meacham. For example, when Meacham was retaliated against and her student status was wrongful changed. She requested that this retaliation be corrected but it was not addressed in a timely manner. Correcting the change to her student status was purposefully delayed until after funding opportunities and benefits were withheld. She was intentionally blocked from funding opportunities at the University and other benefits which forced her to study remotely. When her student status was finally corrected she was eligible for the Honors Society and other awards

but was unable to receive them based on the delays. These damages are irreversible and the opportunities lost cannot be repaid.

270. Meacham was forced to work with respondents of her Title IX claim without any mediation or protective measures in place to prevent further retaliation, discrimination and harassment. One respondent had a no contact order placed on him and by closing the Title IX investigation the university lifted this protective measure. The results included blocks to university resources, funding opportunities, and the refusal to approve new work opportunities on-campus.

271. Meacham was denied access to resources she needed to carryout her responsibilities at University of Illinois. Among the resources Meacham sought were services provided by her program that every other student was given, except Meacham.

272. In November 2019 UIUC Deans removed Meacham from campus at the request of the professors she reported to Title IX and federal agencies. These adverse actions against her mean that due to the retaliation against her, she was punished for participating in these protected activities by preventing her from finishing her entire PhD.

273. By retaliating against Meacham the University and the professors Meacham reported were able to make an example out of her to prevent other students from filing reports with protected offices. The number of students who warned Meacham not to file because it would ruin her academic and professional career is staggeringly high. It became a widely discussed matter where everyone in her PhD program knew she was engaging in these protected activities. If the University had not retaliated and had allowed her to be successful in the program after filing her reports, it would have discredited the professors she reported and

58

confirmed that it is possible for students to engage in protected activities without suffering severe damages.

274. There is evidence to prove the Deans and Chancellors acted outside of their roles to knowingly support retaliation against Meacham. When Meacham's Title IX respondents demanded she be removed from campus, the university carried-out this retaliation. The Deans and Chancellors tried to claim that she had violated student code, based on false charges against her that were never given a fair, unbiased review. For example, their own policies and student code states that students must never be forcibly withdrawn unless every avenue has been explored to remedy the situation. Meacham's appeal cited this policy and the fact that her accommodations were approved but never implemented. With full knowledge about the Title IX reports, the professor's sexual misconduct and the blocks to her accommodations, the Deans refused to consider her appeal. Meacham was told that appeals are never approved. This further supports the danger of allowing the University to make "subjective" rulings about student disciplinary measures because it conflicts with their Title IX, Title VII, and ADA rights.

275. As a result, Meacham was wrongfully removed from campus and retaliated against by respondents in her Title IX reports and by administrators who referred to her disabilities as 'disruptions'.

276. There is evidence to suggest that Meacham was blocked from working with people at other organizations, and at UIUC based on the character defamation from my Title IX respondents such as Samuel Beshers, Martha Gillette, Stephanie Pregant, and others, and from UIUC administration, including Alexis Thompson, Stephen Bryan, Justin Brown from the OSCR.

277. The Title IX reports included one version that cited race as the basis for one aspect of my claims. However no measures were taken by the university offices to ensure this claim could be safety investigated. There are in fact no clear laws within Title IX or OCR or the Department of Education that even address how to handle this aspect of my claim. This would require the decision of a federal court so that these offices have the necessary regulations outlining how they must even handle this aspect of Title IX, Title VII, and civil rights violations in this context.

278. In charges filed against Meacham with the Office of Student Conflict Resolution (OSCR), which handles disciplinary actions against university students, references were made to Meacham's engagement in protected activities at other organizations. When Meacham requested copies of these charges, she was denied. When Meacham requested to view these charges with the appropriate accommodations, and to have the necessary time to read and review these charges, which included protected activities, she was denied. Instead, she was charged and the disciplinary measures are in place.

279. Meacham reported that Title IX investigators mishandled her charges. She also presented the university-level problems with the Title IX/ODEA process to the Board of Trustees in Spring 2019. After these reports were made by Meacham, her cases were still mishandled, but also prematurely closed, in some cases. Later, she was also retaliated against by the Title IX/ODEA officers.

280. As part of the retaliation against Meacham, she was blocked from necessary resources to perform her duties by UIUC employees and administration. One incident involved a Dean who discriminated against her based on disability. This Dean was already reported by Meacham for engaging in retaliation against her, but the university refused to even

address these problems. This Dean harassed Meacham repeatedly in-person in one such
horrifying incident where she prevented Meacham from registering for courses and seeking
resources from a public student services building. Meacham was publicly discriminated against
and harassed and then retaliated against for seeking help from this Dean's manager. Based on
this retaliation other Deans supported further retaliatory activities against Meacham. She was
further targeted and subject to false character defamation. She was discredited based on these
activities. The result of these actions was more intimidation and denial of resources.

281. The University has systemic policies that supported retaliation against Meacham
and Deans whose role it is to protect students did not ensure her safety on-campus. Meacham
first reported feeling unsafe on-campus after she was threatened by professors in Fall 2017.
Instead of prevent the reported harassment, bullying, and retaliation, the University removed
Meacham from campus in Fall 2019.

282. This further demonstrates the systemic retaliation enforced by a broken university
system, whereby graduate employees reports are dismissed, downplayed, and/or ignored, and
instead an imbalance of power is created to protect professors guilty of violating civil, state and
federal laws.

283. It is also important to report that the University owns its own police force called
the UIPD so students who try to report rape, assault, and other serious crimes are never able to
find an unbiased authority with jurisdiction over the campus. There are two neighboring police
departments, one in Champaign, and one in Urbana, but neither office has jurisdiction over
events on campus. Due to this fact, professors are aware of these loopholes to avoid appropriate
legal ramifications for their inappropriate or illegal actions. In fact, there is a direct relationship
between the UIPD and the Office of Student Conflict Resolution (OSCR) and other University

Offices such as the Graduate College. This constitutes a conflict of interest and it also results in the University's Graduate College, OSCR, and other offices to enforce academic punishments for reports filed in confidence with the UPID. It also means that other police offices outside the campus may be swayed or required, in some cases, to disclose confidential information shared with these police officers.

284. The UPID did not address Meacham's reports and she was forced to seek help from police officers outside the UIPD. Meacham was subject to unlawful retaliation, sexual discrimination, and disability discrimination based on confidential information she shared with police officers outside the UPID. The University's Office for Student Conflict Resolutions (OSCR) cited confidential reports she shared with these external law agencies as justification for disciplining her on-campus. Attempts were made to discredit Meacham based on these reports.

285. Meacham was subject to retaliation including Interference with her Apple Inc. contract and prospective opportunities with other organizations. The University approved Meacham to work at Apple Inc. as an Intern in Summer 2018 but then violated Meacham's rights after she engaged in protected activities by forcing her to sign a legal contract with the University at the threat of academic punishment. The contract with NSP violated her Non Disclosure Agreement (NDA) with Apple Inc. and she was punished for refusing to violate her NDA by the University. The University changed Meacham's academic status from "good" to "poor".

286. This resulted in loss of funding opportunities and also prevented Meacham from receiving value for her work, as well as honors such as from the National Honors Society. Meacham was entitled to these opportunities, awards, and earned value, based on her work and

achievements at U of I. The NSP, specifically the professors who Meacham reported for illegal activity, benefited from these adverse actions against Meacham, in part because fabricating false portrayals of Meacham as a poor or unqualified employee and student disproved Meacham's charges against them.

287. After engaging in protected activities, Meacham was blocked from job opportunities and she was not properly compensated for her work at UIUC. Meacham did not receive course credit and other forms of value that other employees and graduate students receive. In fact, the university went out of its way to ensure that Meacham's official transcript was damaged and refused to correct false information, inconsistencies, or even release her final grades for work she completed. In academia, graduate employees are compensated for their work on campus in the form of course credit in place of the normal financial compensation these employees would otherwise be entitled to receive.

288. Additionally, there is evidence to support the claim that the same professors who demanded Meacham be disciplined for reporting them to Title IX and for engaging in protected activities, also blocked Meacham's ability to work in other job positions she was offered. These job offers were withdrawn after she accepted them and the professors she reported were working directly with these professors and their colleagues.

289. The pattern of practice in retaliatory measures against victims like Meacham who report sexual misconduct, harassment, and discrimination creates a culture where victims are pressured to remain silent. This hurts the entire campus and can hopefully be brought to the attention of officials who are able to correct this systemic issue in court. This impacts graduate employees across the state of Illinois.

290. The Neuroscience Program (NSP) at University of Illinois does not meet the lawful standards to justify its status within the academic school system.

291. Due to the Neuroscience Program (NSP) being classified as a 'Program' as opposed to a 'Department' the professors and Director of NSP employees are not entitled to university resources that protect them from Title VII, Title IX, and ADA Law violations.

292. Furthermore, the loophole of the NSP's 'Program' status within the U of I school system creates an imbalance of power between professors and students which is currently exploited. One of the results of this power imbalance is that graduate employees feel pressured not to report legitimate Title VII, Title IX, and ADA Law violations. Graduate employees know that if reports against their professors, whose role is also their boss or manager in paid employment, then academic punishments are the possible outcome.

293. The Plaintiff felt threatened by professors not to participate in protected activities at University of Illinois. Ms. Meacham was told directly by professors that she must "decide between being a PhD Student or being a social advocate". Ms. Meacham was also told in no uncertain terms that if she participated in filing official reports, she would be "forced out of her PhD." Many graduate employees have felt that they must decide between their academic careers, their employment by University of Illinois, or executing their right to participate in protected activities at U of I, such as filing official reports with the Title IX, Office of Diversity and Inclusion, Office of Equality and Access, and with the local government.

294. Ms. Meacham sought help from Title IX, Human Resources, the Ethics Office, and other offices on campus but the U of I failed and/or refused to prevent damages from her participation in protected activities and official reporting. In cases, administrators refused to perform their duties of their jobs and in many cases helped carryout retaliation.

295. Despite the Plaintiff's efforts to inform the Board of Trusted at University of Illinois Urbana-Champaign of problems within the university's outdated student code and university policies in Spring 2018, the campus policies and student code were used to disguise retaliation.

296. The Office of Student Conflict Resolution (OSCR) at U of I Urbana-Champaign claims false motives for "protecting confidentiality" by not releasing written copies of false charges filed against students. In Ms. Meacham's experience, the OSCR

297. The Director of the OSCR refused to recuse himself from processing my case, despite there being an obvious conflict of interest.

298. The Director of the OSCR filed charges against me that were false and/or baseless and then reviewed the charges himself, and ruled against me on these charges he filed. The adverse effects from this retaliation and prejudice based on disability and sex was loss of my University positions.

299. Accommodations refused throughout the process discipline. The timing of approval for accommodations, dismissal of Ms. Meacham, and enforcement of discipline against Ms. Meacham are not coincidental. The timing suggests a joint effort between Deans to deny Ms. Meacham her rights to fair process, and to deny her right to accommodations. Ms. Meacham was unable to defend herself fairly due to the

300. New positions must be created to ensure there are no conflicts of interest between professors actions as the academic instructor or grader and their role as manager or boss. Graduate employees need

301. Hiring practices for NSP violate employment rights. There is no distinction between academic hiring and employment for the university so loopholes are exploited to claim

academic freedom protections for professors and the PhD program when in actuality their actions fall under employment rights violations.

302. Impact from participating in protected activities is later used against student in academic assessments and "behavior" assessments.

303. Students who engage in protected activities are later punished for not abiding my student code and university policies. The university has not updated the student code and policies that directly violate student rights, including protection to engage in protected activities on-campus.

304. Ms. Meacham was punished for trying to help victims of sexual harassment, assault and rape. UIUC does not have the proper training for employees to understand how the protected activities Meacham engaged in can benefit the entire community. Instead, she was treated like a 'disruption' to the community.

305. False charges were filed against Ms. Meacham by professors involved in her efforts to file official charges against professors and/or engage in protected activities. No policies at the University protect graduate employees who engage in protected activities from being punished for these activities through their university policies and student codes.

306. Ms. Meacham was subject to character defamation from professors and administrators for participating in protected activities.

307. The UI failed to reasonably address Ms. Meacham's claims of retaliation. As a result, Ms. Meacham became the target for a number of university employees and was unable to access student resources to defend herself.

308. Title IX findings were used to discredit Ms. Meacham and punish her.

309. The Deans Office unfairly charged Ms. Meacham with erroneous allegations.

66

310. Ms. Meacham was unlawfully accused of filing 'bad faith' Title IX charges.

311. Plaintiff was unlawfully removed from campus after engaging in protected activities.

312. Ms. Meacham was refused resources she needed to defend herself or receive a fair review of facts in the Deans processes to rule on retaliatory charges against Meacham.

313. The University of Illinois put the liability concerns of professors and/or administrators before Ms. Meacham's right to engage in protected activities.

314. The University of Illinois put the liability concerns of professors and/or administrators before Ms. Meacham's health and/or safety. The University acted in the interest of protecting itself from liability, by allowing adverse actions to befall Meacham.

315. The University of Illinois put the liability concerns of professors and/or administrators before Ms. Meacham's right to equal opportunity employment and/or access to resources on-campus.

316. Professors and administrators were supported by U of I to refuse service and access to resources. Many of the reasons cited for the refusal of services and access to resources are retaliatory in their motivation. Additionally, many of these individuals made statements that they felt "threatened" by Ms. Meacham despite there being no evidence to support these statements.

317. The U of I claims it has the right to a "subjective" review of facts and evidence when making determinations of student or graduate employee guilt in the OSCR. It also states it may use "subjective" means to decide appropriate discipline. This loophole is exploited by professors and administration to systemically remove or discipline students who report Title

VII, Title IX, and ADA Violations, and/or engage in protected activities. This loophole is also used to support retaliation.

318. The University wrote negative performance reviews about Meacham after she requested accommodations, and before these requests were resolved. This adverse action is clear retaliation.

319. It should be illegal for U of I professors and administrators to terminate positions and/or demote employees, after graduate employees or students have reported Title VII, Title IX, and/or ADA Law violations. Until these reports have been formally resolved these actions constitute rights violations and possible retaliation but there are currently no protective mechanisms in place to defend graduate employees or students from these adverse consequences for engaging in protected activities and/or requesting help from Human Resources, the Graduate College, the Title IX Office, Disability Services, the Ethics Office, and/or the Office of Equal Access.

320. Willful delays or refusal of Human Resources, Ethics Office, Title IX Office, Disability Services, and/or Office of Equal Access resources should be made illegal, and terminating or demoting employees before these offices have responded to reports should be illegal. In Ms. Meacham's case, these events occurred and were never investigated or rectified.

321. Graduate employees and students are burdened when they file reports with the Human Resources, Ethics Office, Title IX Office, Disability Services, and/or Office of Equal Access, which makes it impossible for them to carryout their responsibilities.

322. The process for engaging in protected activities allows officials representing U of I, and protected services on campus, to take the word of the professors without any

documentation or factual evidence to support reports or opinion. This creates an imbalance of power and robs employees and students of their rights

323. UIUC administration and professors are currently allowed to refuse to communicate in writing and/or on-record. Currently these U of I representatives are allowed to demand graduate employees meet with them in-person or speak over the phone and are therefore supported in illegal activities such as threats, intimidation, retaliation, discrimination, and harassment. Ms. Meacham was forced to endure threats, intimidation, retaliation, discrimination, and harassment in this verbal form of communication in order to carryout her responsibilities as an employee and graduate student at UIUC. When she reported these incidents to the appropriate offices on-campus there were no actions taken to prevent this ongoing activity from occurring. Instead, Ms. Meacham was told that if she refused to endure these ongoing activities, then she would be in violation of her contract as an employee and graduate student. Due to the fact that these incidents were included in her original official reports to UIUC Title IX, administration, and other offices it is unconscionable that this behavior would be supported by the university. Thus this refusal to prevent such intimidation, threats, harassment, discrimination and ongoing retaliation suggest that it is a preferred means by which employees who engage in protected activities are treated. Ms. Meacham was pressured to withdraw from the program and leave the university repeatedly after she engaged in protected activities. She was treated as a "threat" to students, professors, administration, and the community.

324. If the university had the best of intentions there is no reason it would not want to record illegal communications and/or communications between their professors, administrators and graduate employees or students that violate civil, state or federal laws. The continued

refusal to prevent intimidation, threats, and harassment suggest that this is intentionally left off-record. As it stands, the university had reports this was occurring, refused to prevent it from occurring, and then approved contracts, student code, and university policies that force graduate employees and students to endure these rights violations as a requirement of their jobs and responsibilities. In Ms. Meacham's case, she was also then accused of "lying" and charged with giving "misleading" and/or "false" information when she reported such activities.

325. Ms. Meacham was systemically punished, disciplined, and forced to withdraw from UIUC due to her attempts to report unlawful activities. Furthermore reports that she communicated with federal agents and the local police were included in reports where she was referred to as a "threat" and other derogatory statements about her character. These reports were used by Deans to justify removing her from campus, forcibly withdrawing her from the university, and/or disciplining her.

326. Ms. Meacham's character was defamed and she was the subject of disciplinary assessments that added burden to her responsibilities and made it impossible for her to be a successful employee, and access necessary resources to fulfill her duties. Therefore it is necessary to explore the extra burden added to employees who become the subject of these university procedures, because the policies and procedures themselves, whether intentional or not, result in blocks to an employee's ability to fulfill their responsibilities and academic obligations. This appears to be a tactic used to retaliate against employees. It also appears to be a tactic used to justify writing "poor performance" reviews about these employees and graduate students. Furthermore it appears that this is part of a process to remove these graduate employees and/or "threats" to the community from their contracts and demote them from their employed positions.

327. Ms. Meacham was not paid for her work at UIUC. She was forced to work for free after engaging in protected activities and filing official reports with the school. Ms. Meacham was also blocked from receiving course credit and other forms of value that other employees and graduate students receive. In fact, the university went out of its way to ensure that Ms. Meacham's official transcript was damaged and refused to correct false information, inconsistencies, or even release her final grades for work she completed. In academia, graduate employees are compensated for their work on campus in the form of course credit in place of the normal financial compensation these employees would otherwise be entitled to receive. This violation to the very foundation of the graduate employee and university labor arrangement cannot be ignored or remain uncorrected. This impacts graduate employees across the state of Illinois.

VII.  **Willful Negligence; Misclassification of Graduate Employees & Graduate Programs**

328. Professors at UIUC are supported by the University's administration in illegal hiring and firing practices. These include forcing students to work for free in unregulated positions before formally hiring students in employed research or Teaching Assistant ("TA") positions. If students refuse to go along with these requests then they will lose out on positions and other opportunities or be blacklisted by professors.

329. If graduate employees refuse to go along with illegal hiring and illegal employment requests, or if graduate employees object to any illegal employment practices during these of-the-record positions, or report violations to their employment rights, then professors wont formalize the position and other opportunities or the professors will blacklisted the employees or students. Often these professors deny ever having even made the off-the-record arrangement or offer.

71

330. At UIUC, administration supports professors by falsely claiming Academic Freedom Laws protect professors against charges of civil rights violations, including Title IX and Title VII, or ADA Laws. When graduate employees report civil rights violations, including under Title IX, Title VII, and/or the ADA, they are treated like a legal liability and retaliated against severely by administration and professors.

331. When Plaintiff arrived at the University in 2017, there were 6 employed students who wanted to report unlawful conduct by their supervisors but were too afraid to do so because they did not want to lose their PhDs or careers.

332. Plaintiff was issued a series of demands by the university administrators with unreasonable deadlines and requirements that Plaintiff was told is the tactic UIUC uses to build a false case against employees to claim they have 'performed poorly'. However, none of Meacham's peers within her PhD program were asked to perform in the same way.

333. It is known by members of the University community that the word "behavior" is used to conceal prejudice and retaliation for engaging in protected activities.

334. Among the professors that Meacham reported were individuals crucial to a new medical center that brought significant funding to UIUC. This center created a new source of income for the University and provided opportunities to other professors who had reason not to support Meacham's charges against these individuals.

335. Plaintiff worked with the University's student union to improve conditions for all graduate employee contracts when the Deans Office removed her from campus, citing these problems that Meacham identified and her engagement with this process to correct them as one of their reasons.

336. At UIUC administration supports professors by falsely claiming Academic Freedom Laws to protect professors against charges of civil rights violations, including Title IX and Title VII, or ADA Laws. The University also invokes these laws illegally in order to refuse to correct said rights violations that are brought to their attention.

337. When graduate employees report civil rights violations, Title IX, Title VII, and/or ADA violations, the administration does not support them. Instead, employees who file official reports are treated like a legal liability and retaliated against severely by administration and professors. When Meacham arrived on campus there were 6 employed students who wanted to report their boss but were too afraid to do so because they did not want to lose their opportunities to obtain their PhDs or otherwise have their careers negatively impacted. In Meacham's case, she was issued a series of demands by the University, with impossible deadlines and requirements after she reported Title IX, Title VII, and ADA Violations to the University. Meacham was told is the tactic UIUC uses to build a false case against employees to claim they have 'performed poorly'. However, no other graduate employees are asked to perform in the same way. In the case of sexual misconduct this pattern of practice is extremely dangerous to graduate employees and student health and safety.

338. There need to be more regulations about 'Academic Freedom' when it comes to employed university positions – it is unfair that professors use this as a loophole to engage in illegal hiring and firing practices. This type of subjective assessment for employee performance should be made illegal and included in existing employment laws. In my particular case, I was working with the student union to make this request for all graduate employee contracts when the Deans Office removed me from campus, citing this as one of their reasons for wrongfully removing me.

339. It is also important to report that UIUC owns its own police force called the UIPD so students who try to report rape, assault, and other serious crimes are never able to find an unbiased authority with jurisdiction over the campus. There are two neighboring police departments, one in Champaign, and one in Urbana, but neither office has jurisdiction over events on campus and professors or students who engage in criminal behavior are never given a judicial process and also are at the mercy of UIUC administration to engage in their subjective review process. This charge applies to multiple rights violations so it is repeated below. Please excuse the redundancy in this pro se charge.

340. The Neuroscience Program (NSP) engages in illegal hiring, employment, and firing practices.

341. The Neuroscience Program (NSP) advertises itself falsely when recruiting graduate employees and students.

342. UIUC misclassifies graduate employees within the Neuroscience Program (NSP) and possibly other Departments by falsely recording the number of hours employees work. There are no guidelines that prevent bosses (professors) from overworking graduate employees and this conflict of interest in their roles – often acting as both the academic grader and the boss for employment – results in unfair retaliation academically if students ask for fair and equal employment practices, or report their bosses.

343. Meacham was forced to pay out of pocket for equipment and resources but never received reimbursement.

344. When Meacham reported issues about employment rights violations, she was penalized academically, such as unfair changes to her student status from good to poor, and by blocks to regain Teaching Assistant positions, which are required for her PhD program. She

was also blocked from positions where she would be entitled to representation by the Student Union.

345. Meacham was penalized because she wanted to begin employment after her employment contracts were formally in place, as opposed to working for free beforehand. The University did not uphold these rights and her professor's or managers demanded that she complete work, despite there being no contract, and/or despite there being no payment for the work these managers and professors demanded. The burden falls on graduate employees to fill gaps where the University fails. If graduate employees do not acquiesce to these illegal demands then they are blacklisted, retaliated against, and/or barred from opportunities.

346. The University did not compensate Meacham fairly for her work. Meacham's managers were allowed to make unreasonable demands and force her to work without appropriate work agreements or contracts in place. She was also made to work more than the specified hours outlined in her contracts and take on roles outside of the specified responsibilities of her employment contracts.

347. The University failed to provide a safe work environment for Ms. Meacham even after she reported incidents through the appropriate channels at UIUC.

348. The University failed to uphold even its own University policies for employment, including firing.

349. Professors are permitted to engage in character defamation about their employees and when Meacham brought this to the attention of professors and administrators, she was told that this is the right of UIUC Professors. She was informed that the professors always engage in this behavior because it is their method for selecting who they employee and it is used to warn other professors not to hire certain students.

350. Ms. Meacham was pressured to share her Intellectual Property (IP) as part of her graduate employment and graduate activities at UIUC. In one case, the professor was funded but pressured Ms. Meacham to share her IP with the promise of employment. She was denied this opportunity when she did not share all of her IP and when she informed professors and administrators of these incidents, some were respondents in her reports, they refused to correct this issue. She suffered damages as a result.

## VIII.  Damages Suffered by Plaintiff.

351. As a result of Defendant's unlawful discrimination and retaliation, Meacham was removed from employed positions, and her reputation was permanently damaged. She was slandered so severely that positions she was offered were withdrawn on multiple occasions.

352. The university knew Meacham was forced to work for free and yet Meacham was never given any compensation for this work, and in some instances she was never even given proper course credit.

353. Instead, Meacham was referred to as a legal liability and a "threat" to professors because she participated in protected activities. Based on this retaliation and sex based prejudice against victims, Meacham was robbed of a fair, unbiased review of the facts in the incidents she reported.

354. Meacham was also discriminated against based on disability and denied reasonable accommodations her doctors recommended as necessary. This discrimination forced her to pay for her own accommodations and she suffered significant financial losses.

355. Meacham reported retaliation but the University systemically retaliated against her and refused to prevent these issues from occurring. The damages from this were significant and altered the course of her entire career. She was forced to change her PhD focus, change her

employment and even study remotely at a University. Meacham had been denied access to resources she needed for her jobs and academics so she was forced to study remotely where she received these resources and opportunities. The personal damages that she suffered were financial losses, losses to funding opportunities, and other employment opportunities.

356. Meacham was never reimbursed for any of the damages and expenses she incurred, despite her requests that the University address these outstanding issues. The reasonable resolution she requested was the chance to study with funding in a new lab but she was denied.

357. In Fall 2019 the Deans blocked Meacham's professors from releasing her grades. At this point Meacham had straight As, and she was in the Honors Society. Every one of Meacham's professors went on record expressing support to release her grades. Professor wrote that she had completed all of the work for the course and there was no reason except intentional damages that the Deans would prevent this earned credit from being applied to Meacham's transcript. The damages from this action against Meacham mean that her permanent transcript is damaged. This prevents her from receiving other professional and academic opportunities.

358. Graduate employees in PhD programs are roughly paid ~$20,000 annually which is well below their actual employment value. For example, in industry Meacham's value is roughly ~$120,000 annually, which means she was earning less than six times her actual value at the University. The University is able to justify this by offering training and value in course credits and other opportunities. Due to the retaliation and incidents Meacham reported she did not receive these opportunities, such as training or even course credit for the work she performed. The damages from this are significant.

359. Graduate employees at the University are basically full-time employees in most cases, forced to work at a desk, forced to attend lab meetings, forced to put in more than the

hours the University officially records them as being employed. This is true for Meacham and she was continually misclassified in her employment contracts. This misclassification resulted in losses for research IP that Meacham worked on but never received proper compensation or even credit for working on.

360. Meacham's case is particularly poignant because she own my own Intellectual Property (IP) which is something her adviser and other professors pressured her to give them in exchange for the promise of being hired. This means that she is unquestionably qualified for the roles she was asked to perform, and that she brought her own skill-sets, her own knowledge and that the value she brought to these positions was never fully compensated. Meacham brought her own IP to the University and the labs she worked in pressured her to share this IP without compensation. The University forced her to work in these labs for free when they retaliated against her. This means Meacham never received wages or compensation for her unpaid work. Some of this work was never formalized and intentionally kept off record. Meacham asked for help from the University but these issues remain unresolved.

361. In Meacham's case, the healthcare services were so bad that she was forced to pay out of pocket to receive appropriate medical resources as a University employee. This was an additional hidden expense she was forced to pay for after already paying health insurance fees. These health insurance fees are not covered by the University and were paid from her own earnings. Meacham was told by the Disability Resources and Services Office that her medical disability is among the most common at the University, however there are not enough medical doctors for students with this disability employed by the University's medical services. This demonstrates a University-wide systemic prejudice against graduate employees with disabilities. Meacham was told by these medical facilities that she would have to pay out of

pocket and visit the Emergency Hospital in order to receive the regular medical appointments she needed. These financial expenses are an unfair burden that is the direct result of the University's failure to uphold its legal requirements for providing services to students with disabilities.

362. Meacham's ability to seek opportunities elsewhere has been intentionally damaged and her reputation has been damaged. Meacham was blocked from transferring to other PhD programs in directly related fields and she will be forced to begin a new career. This means Meacham must delay her plans to start a family and these losses are immeasurable.

363. Meacham was forcibly withdrawn from the University which means she must start her PhD research from scratch at a new university if the U of I refuses to reappoint her. This is immeasurable in terms of losses and the financial damages, career damages, damages to her reputation, not to mention the impact on her ability to have children and a family are too great to measure. Meacham's investment in her graduate studies exceeds $278,000, not to mention time, personal sacrifice. The damage from being forcibly withdrawn from the University is that she has lost the opportunity to earn her PhD in Neuroscience and enter the field she has prepared to work in for over 12 years. She lost a lifelong dream, which is priceless.

**COUNT I -- VIOLATION OF TITLE VII**

364.  Plaintiff repeats, realleges, and incorporates the previous allegations as though fully set forth herein.

365. Defendant's unlawful discrimination and retaliation against Plaintiff were in violation of the rights secured to her by Title VII.

366. By the conduct described above, Defendant intentionally violated Plaintiff's rights under Title VII.

79

367.  As a result of the violations of her Title VII rights, Plaintiff is entitled to equitable relief, including "make-whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendant's unlawful actions.

368. As a result of Defendant's intentional violation of Plaintiff's Title VII rights, she has suffered emotional distress, health issues, was removed from campus and blocked from continuing her education, she lost career opportunities, was denied funding, lost other jobs, lost job opportunities, suffered character defamation, was blocked from resources, lost benefits, and lost substantial wages. She has been forced to pay for employment expenses, accommodations and benefits that she is entitled to from the Defendant under Title VII.

369. In its discriminatory and retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Plaintiff's rights, thereby entitling her to an award of punitive damages.

370. To remedy the violations of Plaintiff's rights secured by Title VII, Plaintiff requests that the Court award the relief prayed for below.

## COUNT II -- VIOLATION OF TITLE IX

371. Plaintiff repeats, realleges, and incorporates all previous allegations as though fully set forth herein.

372. Defendant's unlawful discrimination and retaliation against Plaintiff were in violation of the rights secured to her by Title IX.

373. By the conduct described above, Defendant intentionally violated Plaintiff's rights under Title IX.

374.  As a result of the violations of her Title IX rights, Plaintiff is entitled to equitable relief, including "make-whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendant's unlawful actions.

375. As a result of Defendant's intentional violation of Plaintiff's Title IX rights, she has suffered emotional distress, and lost substantial wages.

376. In its discriminatory and retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Plaintiff's rights, thereby entitling her to an award of punitive damages.

377. To remedy the violations of Plaintiff's rights secured by Title IX, Plaintiff requests that the Court award the relief prayed for below.

## COUNT III -- VIOLATION OF THE ADA

378. Plaintiff repeats, realleges, and incorporates all previous allegations as though fully set forth herein.

379. Plaintiff is an individual with a disability and/or a record of a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.*

380. Defendants' unlawful conduct based upon Plaintiff's disability was in violation of the rights secured to her by the ADA.

381. By the conduct described above, Defendant intentionally violated Plaintiff's rights under the ADA.

382.  As a result of the violations of her ADA rights, Plaintiff is entitled to equitable relief, including "make-whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendant's unlawful actions.

383. As a result of Defendant's intentional violation of Plaintiff's ADA rights, she has suffered emotional distress, and health complications, thereby entitling her to compensatory damages.

384. In its discriminatory and retaliatory actions as alleged above, Defendant acted with malice or reckless indifference to Plaintiff's rights, thereby entitling her to an award of punitive damages.

385. To remedy the violations of Plaintiff's rights secured by the ADA, Plaintiff requests that the Court award the relief prayed for below.

COUNT IV – VIOLATION OF TAX FREE STATUS

386. Plaintiff repeats, realleges, and incorporates all previous allegations as though fully set forth herein.

387. Defendant's unlawful pattern of practice in hiring, employment, and firing enables violations of the rights secured to Plaintiff by Title IX, Title VII, and ADA Laws.

388. By the conduct described above, Defendant intentionally violated Plaintiff's rights under the Department of Education definition of its responsibilities and role of an Academic Institution.

389. As a result of the violations of her Title IX, Title VII, and ADA rights, Plaintiff is entitled to request that the Defendant correct the outdated policies, student codes, and systemic problems that resulted in said rights violations.

390. As a result of Defendant's intentional misclassification of employees, unlawful structure for graduate programs (specifically the Neuroscience Program), the Defendant is capable of violating Plaintiff's Title IX, Title VII, and ADA rights.

391. As a result of Defendant's intentional misclassification of employees and/or permitting Defendants to intentionally hold conflicting roles and responsibilities (conflicts of interest as part of an office or University Representative) the Defendants are capable of violating Plaintiff's Title IX, Title VII, and ADA rights.

392. As a result of Defendant's intentional violation of Plaintiff's Title IX, Title VII, and ADA rights, she has suffered emotional distress, health damages, irreversible career and academic damages, and lost substantial wages.

393. In its discriminatory and retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Plaintiff's rights, thereby entitling her to an award of punitive damages.

394. In these unlawful actions alleged above, Defendant has acted outside its role as an Academic Institution.

395. In these unlawful actions alleged above, Defendant has acted in malice or reckless indifference to Plaintiff's rights, intending to avoid legal liability based on these misclassifications and/or conflicts of interests.

396. In these unlawful actions alleged above, Defendant has acted in malice or reckless indifference to Plaintiff's rights, intending to avoid legal liability based on these misclassifications and/or conflicts of interests, thereby entitling her to an award of damages to be determined by the judge.

397. In these unlawful actions alleged above, Defendant has acted in malice or reckless indifference to Plaintiff's rights, thereby warranting an award of revised policies and new protective laws for victims of Title IX, Title VII, and ADA violations.

398. To remedy the violations of Plaintiff's rights secured by the ADA, Plaintiff requests that the Court award the relief prayed for below.

### COUNT V – VIOLATION OF ACADEMIC FREEDOM LAWS

399. Plaintiff repeats, realleges, and incorporates all previous allegations as though fully set forth herein.

400. Defendant's unlawful pattern of practice in the use of Academic Freedom Laws has enabled Defendants to abuse positions of power and escape legal liability.

401. Defendant's unlawful pattern of practice in misuse of Academic Freedom Laws violates the rights secured to Plaintiff by Title IX, Title VII, and ADA Laws.

402. By the conduct described above, Defendant intentionally violated Plaintiff's rights under the Academic Freedom Laws.

403. In its discriminatory and retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Plaintiff's rights, thereby entitling her to an award of damages to be determined by the judge.

404. In these unlawful actions alleged above, Defendant has acted in malice or reckless indifference to Plaintiff's rights, thereby warranting an award of revised policies and new protective laws for victims of Title IX, Title VII, and ADA violations.

405. In these unlawful actions alleged above, Defendant has acted outside the Academic Freedom Laws.

406. Defendant's unlawful pattern of practice intentionally misusing Academic Freedom Laws for hiring, employment, and firing enables violations of the rights secured to Plaintiff by Title IX, Title VII, and ADA Laws.

407. Defendant's unlawful pattern of practice intentionally misusing Academic Freedom Laws to avoid legal liability and engaged in unlawful rights violations secured to Plaintiff by Title IX, Title VII, and ADA Laws.

408. In these unlawful actions alleged above, Defendant has acted in malice or reckless indifference to Plaintiff's rights, thereby warranting an award of revised policies and new laws to provide further oversight for the way Academic Freedom Laws can be applied and/or interpreted by Defendant.

409. To remedy the violations of Plaintiff's rights secured by the ADA, Plaintiff requests that the Court award the relief prayed for below.

## PRAYER FOR RELIEF FOR ALL VIOLATIONS

WHEREFORE, Plaintiff respectfully request that this Court:

(a)     declare that Defendant's actions were in violation of the law;

(b)     award Plaintiff wages and other benefits she was denied as a result of Defendant's unlawful conduct;

(c)     award Plaintiff compensatory damages;

(d)     award Plaintiff punitive damages;

(e)     award Plaintiff reasonable attorneys' fees and costs;

(f)     award Plaintiff prejudgment interest; and

(g)     award all other such relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial.